The UNITED STATES of America

v.

The KIOWA, COMANCHE AND APACHE TRIBES OF INDIANS,

The Wichita Indian Tribe of Oklahoma and Affiliated Bands et al.,
Intervenors.

Appeal No. 12–71.

United States Court of Claims.

June 20, 1973.

As Amended on Denial of Rehearing Sept. 28, 1973.

Durfee, Senior Judge, concurred in part and dissented in part and filed opinion in which Davis and Kunzig, JJ., joined.

Bernard M. Sisson, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellant.

J. Roy Thompson, Jr., Washington, D. C., attorney of record for The Kiowa, Comanche and Apache Tribes of Indians, appellees.

Omer Luellen, Hinton, Okl., attorney of record for The Wichita Indian Tribe of Oklahoma, etc., intervenor. Paul M. Niebell, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

NICHOLS, Judge.

This case is before the court on appeal from the Indian Claims Commission (Commission) decision in its Docket No. 257. The Appellees', Kiowa, Comanche and Apache Tribes filed a claim with the Commission in 1951 in which they claimed aboriginal title to areas of Texas, Oklahoma, New Mexico, Colorado and Kansas, and recognized title to the lands set out as Tracts 511 and 510 on Plate CLXIV, Texas and Portions of Adjoining States, Part II of the 18th Annual Report of the Bureau of American Ethnology, 1896–1897 (Royce Areas 510 and 511). This appeal involves only the claim of title to Areas 510 and 511 as allegedly recognized in the Treaty with the Comanche and Kiowa Tribes, concluded on October 18, 1865.

The Appellee-Tribes filed a motion for summary judgment on the issue of recognized title on February 13, 1970. Before the Commission ruled, The Wichita Indian Tribe of Oklahoma and Affiliated Bands filed a motion for leave to intervene, originally claiming aboriginal title to the land in question and subsequently claiming recognized title under the Treaty of 1865. The Commission granted the motion for leave to intervene. Both Appellees—Kiowa, Comanche and Apache Tribes—and Appellant, United States, seek reversal of this Commission

decision. It granted the motion for summary judgment and the United States appeals. We reverse on both issues.

We will first deal with the issue of the claimed recognized title of the Kiowa, Comanche and Apache Tribes and then will turn to the issues raised on the question of intervention by The Wichita Indian Tribe of Oklahoma and Affiliated Bands (intervenors).

The Appellees' claim of recognized title rests on the language of the Treaty of October 18, 1865, 14 Stat. 717, 718. Article II thereof reads:

ARTICLE II. The United States hereby agree that the district[1] of country embraced within the following limits, or such portion of the same as may hereafter from time to time be designated by the President of the United States for that purpose, viz: commencing at the northeast corner of New Mexico, thence south to the southeast corner of the same; thence northeastwardly to a point on main Red river opposite the mouth of the North Fork of said river; thence down said river to the 98th degree of west longitude; thence due north on said meridian to the Cimarone river; thence up said river to a point where the same crosses the southern boundary of the State of Kansas; thence along said southern boundary of Kansas to the southwest corner of said State; thence west to the place of beginning, shall be and is hereby set apart for the absolute and undisturbed use and occupation of the tribes who are parties to this treaty, and of such other friendly tribes as have heretofore resided within said limits, or as they may from time to time agree to admit among them, and that no white person[2] except officers, agents, and employés of the government shall go upon or settle within the country embraced within said limits, unless formally admitted and incorporated into some one of the tribes lawfully residing there, according to its laws and usages. The Indians[3] parties hereto on their part expressly agree to remove to and accept as their permanent home the country embraced within said limits, whenever directed so to do by the President of the United States, in accordance with the provisions of this treaty, and that they will not go from said country for hunting or other purposes without the consent in writing of their agent or other authorized person, specifying the purpose for which such leave is granted, and such written consent in all cases shall be borne with them upon their excursions, as evidence that they are rightfully away from their reservation, and shall be respected by all officers, employés, and citizens of the United States, as their sufficient safeguard and protection against injury or damage in person or property, by any and all persons, whomsoever. It is further agreed by the Indians parties hereto that when absent from their reservation, they will refrain[4] from the commission of any depredations or injuries to the person or property of all persons sustaining friendly relations with the government of the United States; that they will not while so absent encamp,[5] by day or night, within ten miles of any of the main travelled routes or roads through the country to which they go, or of the military posts, towns or villages therein, without the consent of the commanders of such military posts, or of the civil authorities of such towns or villages, and that henceforth they will and do hereby relinquish all claims[6]

1. Reservation for Indians who are parties hereto.

2. Boundaries. No whites, except, &c. to settle thereon, unless, &c.

3. Indians to remove thereto, and not leave, unless, &c.;

4. to refrain from depredations;

5. not to encamp within ten miles of, &c.

6. Claims to other lands relinquished.

or rights in and to any portion of the United States or territories, except such as is embraced within the limits aforesaid, and more especially their claims and rights in and to the country north of the Cimarone river and west of the eastern boundary of New Mexico.

The land described in the above article constituted Royce Areas 510 and 511. The origin of the controversy in this case is the phrase "the district of country embraced within the following limits, or such portion of the same as may hereafter from time to time be designated by the President of the United States for that purpose * * * ". The question of whether the 1865 Treaty recognized title in the Appellees gains particular import because in 1867 by another Treaty, 15 Stat. 581, the United States established a reservation for the Appellees which was comprised of only Royce Area 510, some 3,000,000 acres. Thus if title to both Royce Areas 510 and 511 was recognized in the 1865 Treaty the Appellees would have a claim to be compensated for the loss of Royce Area 511.

The Commission, in an opinion signed by four commissioners, held that the Treaty recognized title to both Areas, but there was a dissent by Chairman Kuykendall.

Appellant tells us that the Senate never intended to and did not ratify the recognition of title to Royce Areas 510 and 511 in the 1865 Treaty. We are told that a large portion of the Area in question was within the boundaries of the State of Texas, and that other Tribes had claimed portions of the Area. Texas retained its public lands upon entering the Union. Therefore, the Appellant points out that the United States cound not grant title to a good portion of the land in question and it would be contrary to the presumption of good faith on the part of public officials to assume that such a grant was intended. The Appellant invites the court to inspect the language of the Treaty and asserts that in order for there to be a recognition of title there must be language of permanent use and occupation. Appellant would have the court interpret the language of the Treaty to be a temporary recognition of the right to occupancy subject to divestment at the order of the President. Events surrounding the signing of the 1865 and 1867 Treaties are seen by the Appellant as support for its interpretation of the Treaties, especially the alleged fact that the Indian signatories did not make specific protestations prior to the 1867 Treaty that the land vested in them in 1865 was being divested. Finally, the defendant views the Treaty of 1867 as the Presidential action called for in the 1865 Treaty.

Appellees point out that in the Treaty of 1865 the Indian Tribes ceded their claims to some 100,000,000 acres of land. In return the United States set aside the 39,680,000 acres described in Article II of that Treaty. The Appellees contend that the allegation by Appellant that the United States did not have title to the Area in question is of no import in the issue of the Indians' right to be compensated for land the United States purported to grant. The Appellees view the language of the 1865 Treaty as recognizing permanent title in the Areas of Royce Area 510 and 511 and point out that the language of recognition in the 1865 Treaty is substantially similar to the language of the 1867 Treaty, which in prior litigation has been deemed to have recognized title to Royce Areas 510 in these tribes. See, United States v. Kiowa, Comanche and Apache Tribes of Indians, 163 F.Supp. 603, 143 Ct.Cl. 534, aff'd on rehearing, 143 Ct.Cl. 545, 166 F.Supp. 939 (1958), cert. denied, 359 U. S. 934, 79 S.Ct. 650, 3 L.Ed.2d 636 (1959).

Appellees also say that Appellant misreads the events surrounding the 1865 and 1867 Treaties, and views them as supporting their position. Appellees point out that failure to protest a Treaty has been held not to deprive Tribes of the rights lost by that Treaty, and note that even a passing reference to the statements made by the Chiefs present at the Treaty negotiations would

reveal their displeasure at the treatment they were receiving at the hands of the United States. The Appellees note that neither the events leading up to the 1867 Treaty nor the language of that Treaty indicate that it was to be an implementation of the Treaty of 1865. Conversely the Appellees argue that the language of the 1867 Treaty indicates a recognition of the permanent title vested by the 1865 Treaty. On this point the Appellees say that the 1865 Treaty called for Presidential action while the 1867 Treaty was entered into as the result of the activities of a Congressionally appointed commission. Finally, the Appellees contend that the acceptance of Appellant's interpretation of the 1865 Treaty would result in the Tribes having ceded to the United States 100,000,000 acres of land in exchange for nothing in 1865 and finally in exchange for some 3,000,000 acres of land in 1867. Such a holding we are told would be contrary to fair and honorable dealings and fly in the face of the fiduciary duty assumed by the United States towards the Indians.

In reaching our decision, we have found it unnecessary to consider all of these issues.

■ The intentions of the parties to an Indian Treaty need not be demonstrated by formal language. Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 146 Ct.Cl. 421 (1959). Therefore a court must take special care in interpreting such a Treaty so as to be able to understand what was intended. When a court endeavors to interpret a Treaty between the United States and an Indian Tribe it is bound by the unambiguous words of that Treaty and cannot rewrite them. United States v. Choctaw Nation, 179 U.S. 494, 21 S.Ct. 149, 45 L.Ed. 291 (1900); Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L.Ed. 985 (1945). Where the words of the Treaty leave room for more than one interpretation the court is to interpret the Treaty in a manner not prejudicial to the Indians. Worcester v. Georgia,

31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). In interpreting the words of the Treaty, the proceedings leading up to the Treaty and the events which follow it should be examined if necessary in order to elucidate the intention of the recognizing party, the United States. Miami Tribe of Oklahoma, *supra*; Crow Tribe of Indians v. United States, 284 F.2d 361, 151 Ct.Cl. 281, cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1960). Thus in order to reach a conclusion as to whether the 1865 Treaty recognized title to Royce Areas 510 and 511 one must first attempt to ascertain the intention of the parties from the language of the Treaty. As stated by Judge Madden in The Miami Tribe of Oklahoma, 175 F. Supp. at 940, 146 Ct.Cl. at 445:

> * * * By "recognition", the courts have meant that Congress intended to acknowledge, or if one prefers, to grant, to Indian tribes rights in land which were in addition to the Indians' traditional use and occupancy rights exercised only with the permission of the sovereign. Those additional rights may be sufficient to spell out fee simple title in the Indians if that is what Congress wished, or they may result in something less than fee simple title. The extent of those new and additional rights and the accompanying obligations of the sovereign and the tribe will usually be determined by the Congressional enactment, the treaty, or the agreement, conferring them. * * *

The language of the 1865 Treaty indicates that the Areas granted were subject to redefinition and diminution at the will of the President. The Tribes were granted Royce Areas 510 and 511 "or such portion of the same as may hereafter from time to time be designated by the President of the United States for that purpose." It is true that the Treaty spoke of the land granted as the Indians permanent home; however, that does not detract from the fact that the *extent* of that grant was left to later determination. Therefore, without a demonstration of a contrary intention on the

part of the United States the language of the 1865 Treaty would defeat the Appellees claim.

The Appellees point to a number of cases which hold that the language need not state formally that the United States intends to recognize title in order for recognition to be accomplished. In *Miami Tribe of Oklahoma*, for example, Judge Madden viewed the Tribe's right to occupy the land in question permanently or until they were disposed to sell it as tantamount to recognized title. In that case if the Indians chose to sell the land they could sell only to the United States, which Appellant urged diminished the nature of the title held. Judge Madden disposed of the Government's argument by noting 175 F.Supp. at pp. 936, 938, 146 Ct.Cl. at pp. 439, 441, that:

> Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to *permanently* occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as "treaty title", "reservation title", "recognized title", and "acknowledged title" * * *
>
>   *    *    *    *    *    *
>
> * * * an agreement to permit the Indians to occupy land permanently or until they were disposed to sell it to the United States seemed to the Commission, as it does to us, to be a clear indication of an intention on the part of the United States to recognize in the Indian treaty parties more than aboriginal use and occupancy title to the land in question.

In the *Miami Tribe of Oklahoma* case the nature of the grant was the question before the court while, in the case at bar, the Treaty demands that the court also deal with the question of the extent of the grant. Thus the analogy to *Miami Tribe of Oklahoma* is of little aid to the Appellees because we cannot hold that the 1865 Treaty recognized permanent title in the Appellee Tribes without first answering the question: recog-

nized title to what? We are faced with the language of the Treaty which allegedly, "recognized" title to Royce Areas 510 and 511 "or such portion of the same as may hereafter from time to time be designated by the President of the United States for that purpose * * * *".

The court is aware that formal statements of recognition are not necessary in order that a Treaty be deemed to have recognized title in a particular Tribe. However, as stated in Tee-Hit-Ton v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), "there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation."

The court is also aware of those cases under which either the events surrounding the Treaty or action subsequent to the Treaty were deemed to have demonstrated the intention on the part of the United States to recognize title, notwithstanding the language of the Treaty.

The case closest to the one at bar in which Treaty language was seen as overturned by subsequent action is Klamath & Moadoc Tribes v. United States, 85 Ct.Cl. 451 (1937), aff'd., 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938). In that case the Tribe had entered into a Treaty in 1864 which permitted them to occupy certain territory "until otherwise directed by the President * * * *". Shortly thereafter a portion of the territory granted to the Tribe was mistakenly granted to the State of Oregon which in turn sold the land. The Attorney General of the United States sued to recover the land for the Tribe but was unsuccessful. Whereupon the United States arranged for the exchange of the original tract for a smaller one from the reservation and the payment to the Tribe of $108,750 for the second tract. The purchaser of the second tract sold the lumber thereon for $3,700,000. The Tribe brought suit under a special act for increased compensation for the land taken including the value of the lumber. The United States defended in part by

contending that in the 1864 Treaty the President had retained the power to divest the Tribe of portions of the reservation. The court noted that over the 44 year period in which the events above described transpired the Government had acted in a manner only consistent with its recognition of title to the land in the Tribe. Contrary to the President acting to repossess the land, his inaction and Congressional action to pay for the land taken from the Tribe clearly indicated a recognition of title in the Tribe.

The real point about this *Klamath* case is that the limitation language there involved: "until otherwise directed by the President" did not expressly relate to the territorial extent of the grant, as the corresponding language does here. This court did not speculate, nor did it need to, as to what direction "otherwise" the President might have given. Apparently, by other Treaty provisions, he might have moved other Tribes on the same reservation, or perhaps, he might have put the Klamaths on some other reservation. In either event, suppose they thought of the grant as conveying specific property, there was nothing to suggest in the limitation language that they might be deprived of that property, or part thereof, without compensation. It was expressly spelled out that the location of other Tribes on the reservation would not forfeit any rights guaranteed to the Treaty parties. It was reasonable for this court to conclude, after non-exercise of the Presidential power over 40 years, that it had lapsed, and was no longer a factor in determining the extent of the Klamaths' property interest. The Government, too, had repeatedly since recognized the Klamaths as owners.

Here, on the other hand, the very language of the grant put the grantees on specific notice that the territorial extent of the grant was uncertain and yet to be determined. Instead of embracing a wide range of possibilities, the Presidential action was to focus on one thing only, the territorial extent. It does not seem that any reasonable grantee could have supposed he was getting a *permanent* grant of the entire tract. It is not suggested the Kiowas were so ignorant they actually misunderstood what they were getting, or could have done so. A long lapse of time might have allowed title to firm up to all the two Royce Areas, but no such lapse was allowed to occur. There was nothing to suggest that the President, if he acted, would deprive the Kiowas of anything, rather, he would for the first time define what it was they had, which until then they did not know. The Commission relied mistakenly on this *Klamath* case.

Appellees can point to no action on the part of the President or Congress consistent with the recognition of title. The subsequent Treaty of 1867 unequivocally recognized title to only Royce Area 510. Appellees point to language in Article XI of the 1867 Treaty where reference is made to "the old reservation as defined [in the Treaty of 1865]." Such language simply supports the allegation that some Area was reserved to the Tribes in 1865 but does not dispose of the question of what Area was reserved in view of the phrase permitting the President to set the bounds of the reservation at a later date. Appellees also point to Article XVI of the 1867 Treaty where the Tribes retained the right to hunt on the "lands formerly called theirs". However, in view of the fact that a similar provision was found in the 1865 Treaty it appears likely that this reference is to lands which the Tribes claimed by aboriginal title and not those allegedly recognized in the 1865 Treaty. The Appellees invite the court's attention to the fact that the recognition of Area 510 in the 1867 Treaty which has been upheld by this court, *Kiowa, Comanche & Apache Tribes, supra,* was accomplished by substantially similar language as that used in the 1865 Treaty. We think it significant that absent from the language of the 1867 Treaty was the phrase which reserved the power in the President to set the bounds of the Area granted at a later

date, the very phrase here to be construed.

The negotiations leading to the Treaty of 1865 indicate that while it was intended that an Area be set aside for the Appellees, no agreement was reached as to the boundaries of that Area. In fact the Area described in the proceedings prior to the Treaty differs from that which was designated in either the 1865 Treaty or the 1867 Treaty. After the negotiation and before the ratification of the Treaty of 1865 the Commissioner of Indian Affairs, D. N. Cooley, writing to the Secretary of Interior stated in part:

\* \* \* \* \* \*

\* \* \* As to the treaty with the Kiowas and Comanches. It will be observed, in regard to this treaty, that it does not undertake to limit the Indians to any small reservation, but includes a very large district of country, comprising about 62,000 square miles, which they are to be allowed to have 'absolute and undisturbed use and occupation,' ie: the tribes treated with and 'such as they may agree to admit among them.' This vast region, thus set apart, *may be limited at the discretion of the President.* (Emphasis supplied.)

\* \* \* \* \* \*

It thus appears from this contemporaneous interpretation that the United States did not intend to and did not recognize permanent title to the land in question in the 1865 Treaty.

In attempting to interpret the 1865 Treaty this court is faced with a Treaty which by its words does not recognize *permanent* possession of the lands in question. The words reveal an intent to grant something less than recognized title in the entire Area described. This apparent intent was not contradicted by the proceedings prior to the Treaty nor by interpretations of the Treaty following its signing but prior to its ratification. No action was taken by the United States inconsistent with the apparent intent of the Treaty.

Appellees contend that if this court should hold that the Treaty of 1865 did not recognize title in the Tribes we would be affirming a breach of fair and honorable dealings. This contention is based on the Appellees having had aboriginal title to 100,000,000 acres of land and losing all but 3,000,000 of that land by 1867 without any consideration being given for such loss. If, in fact, Appellees can prove in subsequent proceedings that they had aboriginal title to so much land, this very opinion will support their claim based on unconscionable consideration. However, at this juncture we are not being asked to rule on the question of aboriginal title.

Finally, we are told that the phrase in question called for Presidential action and that the 1867 Treaty was not that action. It was negotiated by commissioners, pursuant to Congressional directive. Appellees seem to glean some significance from the fact that the Treaty of 1867 constituted action of the President with the advice and consent of the Senate, in a manner directed by Congress, instead of individual Presidential action without further Congressional participation. We do not find the distinction persuasive. Nothing in the 1865 Treaty directed the form of action the President was to take.

■ The parties have devoted a great deal of interesting research to whether the 1867 Treaty constituted action by the Congress or by the President. The contending views may be found ably stated in the prevailing and dissenting opinions below. Actually, we think this is irrelevant. If, as we hold, the 1865 Treaty was not intended to grant recognized title to the entire tract, but to leave its territorial extent for later determination, the summary judgment was erroneously granted and the claim based on the 1865 Treaty must fail, whether or not the 1867 Treaty was intended as an exercise of the President's 1865 Treaty power. Our holding is that no recogni-

tion of title to any specifically bounded tract occurred in 1865, and the first such was in 1867.

It does not follow that the Indians had nothing under the 1865 Treaty. They had a moral and equitable claim that the President's power to delimit boundaries be exercised in a manner fair and just to them, in light of their needs and in light of what they had given up; also in light of the lawful claims of Texas and of other Tribes. Thus in Citizen Band of Potawatomi Indians v. United States, 391 F.2d 614, 622, 179 Ct.Cl. 473, 488 (1967), cert. denied, 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839; 390 U.S. 957, 88 S.Ct. 1046, 19 L.Ed.2d 1152 (1968), we said, referring to a right reserved in the President to select 144,000 acres out of a tract granted those Indians:

A fair interpretation of the treaty is that the President would select the 144,000 acres in his capacity as "Great White Father" of the Indians as well as head of the United States Government. A callous disregard of the interests of either would be an abuse of discretion. \* \* \*

A grant of Blackacre or such portion of Blackacre as the grantor might decide upon in his discretion would hardly be considered to convey a marketable title. It is only the peculiar mystique of Indian law that allows a question here. If the grantor of Blackacre stood to the grantee in the relationship of parent, guardian, or trustee, the grantee would have something, but he still could hardly describe himself as the owner of all Blackacre.

Since the summary judgment on recognized title was erroneously granted, it must be reversed on defendant's appeal.

We now turn to the question of intervention by the Wichita Indian Tribe of Oklahoma and Affiliated Bands. As noted above the motion to intervene was filed with the Commission nearly twenty years after the Appellee Tribes filed their claim for relief. The original motion claimed aboriginal title to the area

in question but was expanded to include a claim for compensation under the 1865 Treaty. The preceding portion of our opinion makes the attempted intervention in the claim for recognized title moot. Only the question of the right to intervene in the claim for aboriginal title remains of significance.

In its brief on the question of intervention the intervenors go to great length to demonstrate that in the case of amended pleadings the amendment relates back to the original pleading if no new cause of action is presented and adequate notice was provided to the parties. We will not attempt to explore this line of reasoning because it is clear to us, that this is not a case of amended pleadings. The Appellees are not amending their pleadings to include the intervenors but have vigorously opposed their intervention.

On the question of intervention the parties rely on the cases of Blackfeet & Gros Ventre Tribes v. United States, 162 Ct.Cl. 136 (1963), and Snoqualmie Tribe of Indians v. United States, 372 F.2d 951, 178 Ct.Cl. 570 (1967). (See, United States v. Northern Paiute Nation, 183 Ct.Cl. 321, 393 F.2d 786 (1968), Lipan Apache Tribe v. United States, 22 Indian Claims Commission 1 (1969) ). These cases do not show that a late intervenor may intervene in a claim where his interests are in direct conflict with those of the original claimant. In both the *Blackfeet* and the *Snoqualmie* cases we took pains to show that no intervenor was claiming adversely to the timely claimant. In both cases the litigation involved Treaties to which the intervenors were joint parties. Nor do we see these intervenors as the real parties in interest in the Kiowa, etc., claim. One cannot contend that he is the real party in interest when his claim has been forfeited by his failure to timely file with the Commission.

The result we would reach if we adopted the intervenors reasoning would be to allow a party, too late to file his own claim, to obtain a hearing by ap-

pending his claim to that of another party, timely filed, whose claim he seeks to defeat. It is not a question of one or the other party getting an award admittedly due someone. The proofs adduced on behalf of the Wichitas could easily demonstrate that no one had exclusive control of the tract to which the Kiowas and their group claim aboriginal title, or of parts thereof. The Wichita Indian Tribe of Oklahoma and Affiliated Bands could have timely filed their claim with the Indian Claims Commission. They did not. It would work an injustice to allow them to join in a timely filed suit by the Appellees when the result of that intervention may be the defeat of the Appellees claim, and of any claim.

■ Intervenor has moved to have the court strike that portion of the Government's appeal which challenges its right of intervention. Intervenor argues that the Commission order permitting intervention ·was an interlocutory order which was not appealed within three months as called for by the Act, and that therefore the Appellant's right to appeal from said order has lapsed.

The section of the Act, 25 U.S.C. § 70s(b) (1970 Ed.), which is in question reads as follows:

> In similar manner and with like effect either party may appeal to the Court of Claims from any interlocutory determination by the Commission establishing the liability of the United States notwithstanding such determination is not for any reason whatever ˙final as to the amount of recovery; and any such interlocutory appeal shall be taken on or before January 1, 1961, ˙or three months from such interlocutory determination, whichever is later: *Provided, That the failure of either party to appeal from any such interlocutory determination shall not constitute a waiver of its right to challenge such interlocutory determination in any appeal from any final determination subsequently made in the case.* On said appeal the Court shall determine whether the findings

of fact of the Commission are supported by substantial evidence, in which event they shall be conclusive, and also whether the conclusions of law, including any conclusions respecting "fair and honorable dealings", where applicable, stated by the Commission as a basis for its final determination, are valid and supported by the Commission's findings of fact. *In making the foregoing determinations, the Court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error.* (Emphasis supplied.)

Appellant argues in part that the interlocutory order here in question did not establish the liability of the United States and is therefore not covered by the three months time limit. We need not consider this assertion for it is clear from the above language that Appellant's failure to appeal the order of the Commission was not a waiver of its right to appeal that· order in its appeal of the Commission's final determination on Docket 257. The emphasized portions of the above cited section of the Act permit this court to review the question of intervention in this case.

Accordingly, the decisions of the Indian Claims Commission are reversed, both as to its summary judgment as to recognized title, and as to its order allowing the Wichita Tribe of Oklahoma, et al., to intervene. The cause is remanded to the Commission for further proceedings consistent with this opinion.

Reversed and remanded.

DURFEE, Senior Judge, (concurring in part and dissenting in part):

I concur with the majority in reversing the decision of the Indian Claims Commission which allowed the Wichita Tribe of Oklahoma Affiliated Bands to intervene in this case. However, I respectfully dissent from that part of the majority decision which reverses the order of the Indian Claims Commission

for summary judgment for recognized title by appellees Kiowa, Comanche and Apache Tribes to Royce Areas 510 and 511 under the Treaty of 1865.

The majority holds (1) that "the 1865 Treaty was not intended to grant recognized title to the entire tract" described therein, "but to leave its territorial extent for later determination * * * and the claim based on the 1865 Treaty must fail, whether or not the 1867 Treaty was intended as an exercise of the President's 1865 Treaty power"; (2) "that no recognition of title to any specifically bounded tract occurred in 1865, and the first such was in 1867"; and (3) whether the 1867 Treaty constituted action by the Congress *or* by the President "is actually irrelevant."

These conclusions by the majority are squarely in conflict with the relevant findings and decision of the Indian Claims Commission, with which I concur. In my opinion the grant of title in the 1865 Treaty to the Kiowa, Comanche and Apache Tribes meets the standards of recognized or reservation title, as the Commission determined in citing Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 146 Ct.Cl. 421, 439 (1959) where this court summarized these standards as follows:

\* \* \* \* \* \*

Where Congress has by treaty or statute conferred upon the Indians or acknowledged in the Indians the right to *permanently* occupy and use land, then the Indians have a right or title to that land which has been variously referred to in court decisions as "treaty title", "reservation title", "recognized title", and "acknowledged title." As noted by the Commission, there exists no one particular form for such Congressional recognition or acknowledgment of a tribe's right to occupy permanently land and that right may be established in a variety of ways. Tee-Hit-Ton v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314; Hynes v. Grimes Packing Co., 337 U. S. 86, 69 S.Ct. 968, 93 L.Ed. 1231;

Minnesota v. Hitchcock, 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954.

This court further, in *Miami Tribe,* held that the grant of the right to permanently occupy and use the land ceded by the Treaty until the Miami Tribe should be disposed to sell that land to the United States was "recognized title" and that whether it was held under recognized title or so-called Indian title or under fee simple title, the land should be valued the same way.

For the purpose of clarity, let us first consider what the United States actually granted the Tribes under the 1865 Treaty before we consider the effect of the Treaty alternative for a limitation of the actual grant by Presidential designation.

The majority finds that "the very language of the grant put the grantees on specific notice that the territorial extent of the grant was uncertain, and yet to be determined." In my opinion, the language of the grant itself was certain and specifically described, by a careful metes and bounds description, a tract of over 39 million acres for an Indian reservation. In the language of the Treaty this tract was the "country embraced within said limits," which the Indians agreed "to remove to and accept as their permanent home," and which was "set apart for the absolute and undisturbed use and occupation of the tribes who are parties to this treaty." Articles III, IV and V of the Treaty refer to this tract as the Indians' "reservation." Upon these solemn assurances by their Government in the Treaty, the Indians agree to "relinquish all claims or rights on and to any portion of the United States or territories, except such as is embraced within the limits aforesaid" including their claim of aboriginal title to over 60 million acres.

Let us now consider the effect of the clause following the territorial grant:

ARTICLE II. The United States hereby agree that the district of country embraced within the following limits, *or* such portion of the same as *may* here-

after from time to time be designated by the President of the United States for that purpose, viz: * * *. (Emphasis supplied.)

The Indian Claims Commission interpreted that clause as an alternative, granting the President discretionary power to establish such a smaller reservation by Executive Order if at some indefinite future time the circumstances might, in his discretion, require such action.

I agree with this interpretation by the Commission. The use of the word "or" at the very beginning of the clause clearly means that it was an alternative to an otherwise unconditional territorial grant, an alternative which the President "may" exercise, in his discretion. The Commission has found that "[t]his was never done", 26 Ind.Cl.Comm. at 112, and I agree.

The majority has attempted to distinguish the case of Klamath & Moadoc Tribes v. United States, 85 Ct.Cl. 451 (1937), aff'd, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938), and has stated the facts therein, which need not be repeated except as noted herein. The majority states that in Klamath, "the Tribe had entered into a Treaty in 1864 which permitted them to occupy certain territory 'until otherwise directed by the President * * *' ".

This Treaty did not merely permit the Klamath Tribe to occupy the territory.

Article I of the Klamath Treaty provided:

That the following described tract, within the country ceded by this treaty, shall, until otherwise directed by the President of the United States, be set apart as a residence for said Indians [and] held and regarded as an Indian reservation * * *. 85 Ct.Cl. at 454.

The present majority opinion states that "the real point about this Klamath case is that the limitation language there involved: 'until otherwise directed by the President' did not expressly relate to the territorial extent of the grant, as the corresponding language does here." I cannot agree; all that I can conclude from reading the language of Article I of the Klamath Treaty as quoted is that the limitation did expressly and unmistakably relate to the territorial extent of the grant.

In the Klamath case, the United States contended that the Indian title to 87,000 acres included in the 1864 Treaty was not permanent or exclusive, but merely a right to occupy the lands, and subject to termination by certain articles of the Treaty of 1864. The court there said: "It is asserted that inasmuch as the treaty provisions set aside the delimited reservation to plaintiff Indians, they to occupy the same 'until otherwise directed by the President of the United States', the act of Congress taking the 87,000 acres was an exercise of this power. We cannot assent to the proposition. The President did not exercise any such power if he possessed it. On the contrary, Congress recognized the Indians' right to the lands and sought to pay for them." * * * 85 Ct.Cl. at 463, 464. (Emphasis added.)

The factual difference between the present case and the Klamath case is apparent, but in both cases the Treaty required delimitation of a reservation by the President. In effect, the Klamath case says that action by the Congress is not action by the President as required by the Treaty, and to this extent the case is in point here.

The majority opinion notes that the parties have conflicting views as to whether the 1867 Treaty constituted action by the Congress or by the President. However, the majority of the court concludes that: "Actually, we think this is irrelevant", since no recognition of title to any specifically bounded tract occurred in 1865 and the first such was in 1867. I cannot agree.

The majority reasons that: "It is not suggested that the Kiowas were so ignorant they actually misunderstood what they were getting, or could have done

so." This majority conclusion would require us to believe that the Indians could have understood that the 1865 Treaty grant was a mere permissive use of their reservation until the President acted. They must have also understood that the grant in the 1865 Treaty of a "reservation" of 39 million acres "for their permanent home * * * set apart for the absolute and undisturbed use and occupation of the tribe" was an empty facade of meaningless words, with no substance behind it. I cannot agree that these illiterate "blanket" Indians could have understood this when they agreed to the 1865 Treaty. In my opinion, they understood these words as translated to them, to mean what they mean in plain and unmistakable English.

In my opinion, *they* had good reason to understand and believe that in 1865 they got recognized title to a 39 million-acre reservation, unless and until the President delimited its area. The majority points out that: "It is only the peculiar mystique of Indian law that allows a question here." Actually it is not *Indian* law that allows a question here. It was the white man's law for Indians, which by 1946 had become so unjust and inequitable to the Indians as to require the creation of the Indian Claims Commission.[1] This Commission was given power to determine whether Indian treaties were to be revised on several grounds, including mutual or unilateral mistake, unconscionable consideration, violation of fair and honorable dealings, etc.

Acting under this authority, the Commission has made its decision in favor of the Kiowa, Comanche and Apache Tribes. We are now to reverse this decision basically and in essence because of what the majority thinks the Indians understood or could have understood what they were getting in the 1865 Treaty. There is no peculiar mystique of Indian law that allows a question here, nothing esoteric or mystical about what Indian tribes must understand that they are getting in a treaty with the United States. The Supreme Court of the United States has spelled this out clearly in Peoria Tribe v. United States, 390 U.S. 468, 472, 88 S.Ct. 1137, 1139, 20 L.Ed.2d 39 (1968). The Supreme Court, in reversing this court's judgment stated:

> As the dissenters in the Court of Claims rightly pointed out,

> "Indian treaties 'are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them.' United States v. Shoshone Tribe, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). '[T]hey are to be construed, so far as possible, in the sense in which the Indians understood them, and "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Tulee v. Washington, 315 U.S. 681, 684–685, 62 S.Ct. 862, 86 L.Ed. 1115 * * *' " 369 F.2d at 1006–1007, 177 Ct.Cl. at 771.

Our court has recently ruled on an interpretation of Indian treaties: Hebah v. United States, 428 F.2d 1334, 1338, 192 Ct.Cl. 785, 791 (1970), " * * * Indian treaties should be read, where possible, generously in favor of the Indians. Peoria Tribe v. United States, 390 U.S. 468, 472–473, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968); Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970)"; and Gila River Pima-Maricopa Indian Community v. United States, 467 F.2d 1351, 199 Ct.Cl. 586 (1972), "Indian agreements are to be read as the Indians understood and would naturally understand them." The closest the majority has come to any recognition of these broad and generous principles of Indian treaty interpretation *in favor of the Indians* is that "the

---

1. Act of August 13, 1946 (60 Stat. 1049 et seq.)

court is to interpret the Treaty in a manner not prejudicial to the Indians."

It is in this spirit of strict interpretation that the majority concludes that since no recognition of title to any specifically bounded tract occurred in 1865, and the first was in 1867, the contentions between the parties as to whether the 1867 Treaty constituted action by the Congress or by the President "is irrelevant," (perhaps just as irrelevant as the majority apparently considered the language of the 1865 Treaty referring to the "absolute and undisturbed use and occupation" of a "permanent home" for the appellees).

The majority quotes from Citizen Band of Potawatomie Indians v. United States, 391 F.2d 614, 179 Ct.Cl. 473 (1967), on another point but the quotation is also relevant here as to whether the President or the Congress must act.

> A fair interpretation of the treaty is that the President would select the 144,000 acres in his capacity as *"Great White Father" of the Indians as well as head of the United States government*. A callous disregard of the interests of either would be an abuse of discretion. (Emphasis supplied.) 391 F.2d at 622, 179 Ct.Cl. at 488.

This relationship of the President as "The Great White Father" to his Indian children has been understood by them ever since their first meetings with officials of the United States, when Lewis and Clark summoned them in 1805 to tribal conferences along the expedition's historic route of exploration to the Pacific Ocean. The Indians were told then, and have been told ever since that it is their Great White Father (the President) who will punish them if they are bad, and reward them if they are good. I know of no legal authority, and none has been cited by the majority for its unique proposition that it is irrelevant whether the 1867 Treaty constituted action by the President or by the Con-

gress. In my opinion it is clear that the Indians did not understand this.

The Treaty of 1867 was accomplished by a bill (Act of July 20, 1867, 15 Stat. 17) to establish peace with a large number of Indian tribes, including the appellees, as directed by the Congress. No reference was made to the 1865 Treaty in the 1867 proceedings or in the Act. In dissenting from the majority decision of the Indian Claims Commission, Chairman Kuykendal has nevertheless made this point:

> The two year period between the signing of the 1865 Treaty and the signing of the 1867 Treaty, although a brief period, is included within a longer period (the tenure of President Andrew Johnson) when the animosity of Congress toward the President was the greatest this country has ever experienced. As we have seen, during the last seven months of this period the President was bereft of power to enter independently into any treaties with Indian tribes or to incur any expense in negotiating a treaty. * * * 26 Ind.Cl.Comm. at 128.

Indeed, when the bill under which the 1867 Treaty was finally accomplished was under consideration by the Senate, it was only because two Senators called attention to the constitutional and legal powers of the President in making Indian treaties that he was even included in the Act as finally adopted (as Chairman Kuykendal points out in his review of its legislative history). In such an atmosphere of unparalleled hostility between the President and the Congress, I cannot agree that it was "irrelevant" as to which one acted under the Act of 1867. At least it was not irrelevant to the Indians, who had been unequivocally assured in the 1865 Treaty that the *President* would act, and it was upon this specific assurance that they ceded their claim of aboriginal title to 60 million acres of land. It seems late in the day now to tell them for the first time

that this was a mere irrelevant consideration after reducing their claim of aboriginal title to 100 million acres to 39 million acres in 1865, and then in 1867 to three million acres.

Both the United States and the Commission dissent contended that the Treaty of 1867 was an "implementation" of the Treaty of 1865 and constituted action by the President in compliance with the 1865 Treaty in designating the reservation as Royce Area 510. The Commission, after a well-reasoned review of the record, concluded that the President *never* acted under the 1865 Treaty clause to designate a smaller reservation, and that the 1867 Treaty was not intended to constitute implementation of that clause. Since the majority opinion has in legal effect, disregarded this aspect of the case, because it is "irrelevant" whether the President or the Congress acted, no further discussion is now called for by me in regard to the effect of the 1867 Treaty, except to say that I agree with the above conclusion of the Indian Claims Commission on this point.

Finally, I accept the conclusion of the Indian Claims Commission that the Treaty of 1865 was "a treaty of recognition, the effect of which was to recognize the title of plaintiff tribes and other friendly tribes to Royce Areas 510 and 511." Accordingly, I would affirm the grant of the motion of appellee Kiowa, Comanche and Apache Tribes of Indians for summary judgment, leaving the remaining issues for further determination, except the claim of intervenor, the Wichita Tribe and Affiliated Bands and Groups of Indians which I agree with the majority opinion, should be denied.

DAVIS and KUNZIG, JJ., join in the foregoing opinion concurring in part and dissenting in part.