The YANKTON SIOUX TRIBE

v.

The UNITED STATES.

No. 332–D.

United States Court of Claims.

May 14, 1980.

Patricia L. Brown, Washington, D. C., attorney of record, for plaintiff, Frances L. Horn, Washington, D. C., of counsel.

James E. Clubb, Washington, D. C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, and KUNZIG and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on the joint motion of the parties, filed March 21, 1980, moving that the court adopt as the basis for its judgment in this case the recommended decision of Trial Judge Robert J. Yock, filed October 18, 1979, pursuant to Rule 134(h), since neither party wishes to file any exception thereto. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth,* it hereby grants the parties' motion and affirms and adopts the decision as the basis for its judgment in this case. Therefore, in accordance with the trial judge's decision it is concluded and determined that plaintiff is entitled to recover against defendant a final award in the total sum of $720,615.89 and judgment is entered for plaintiff in that amount.

## OPINION OF TRIAL JUDGE

YOCK, *Trial Judge*: In this case the Yankton Sioux Tribe raises claims arising from the sale of its reservation lands to the United States pursuant to the Agreement of December 31, 1892, Act of August 15, 1894, ch. 290, § 12, 28 Stat. 286 (1894) (section 12 ratified the Agreement with the Yankton Sioux or Dakota Indians, in South Dakota, December 31, 1892, 28 Stat. at 314 (hereinafter cited as Agreement of December 31, 1892)). Specifically, the tribe seeks to recover for the improper handling of both land and trust funds which belonged to the Yankton Sioux Tribe.

A review of the history and events leading up to the instant case will clarify its present posture.

The plaintiff, Yankton Sioux Tribe, originally filed its petition before the Indian Claims Commission on August 10, 1951. That petition was assigned Docket No. 332. In that petition plaintiff alleged several claims against the United States, including a claim for a general accounting which was set out in paragraphs 19, 20, and 21. By order of February 13, 1958, the Indian Claims Commission severed various claims under Docket 332, and the claim for a general accounting was assigned Docket No. 332–B. On the same date plaintiff filed an amended petition under said Docket 332–B in which, in paragraphs 6, 7, 8, and 9, plaintiff realleged almost verbatim the original claim for a general accounting.

A final judgment was entered on behalf of plaintiff in Docket No. 332–B by way of a compromise settlement. *Yankton Sioux Tribe v. United States*, 28 Ind.Cl.Comm. 367, 385 (1972). In pertinent part, the Stipulation for Entry of Final Judgment signed by the attorneys provided:

2. Specifically this settlement shall not affect in any way the following claims in Docket No. 332–B or any procedural or substantive defenses the defendant may have thereto:

a. any claims petitioner may have or assert for an accounting for the period commencing July 1, 1951; and

b. any claims petitioner may have or assert arising from the sale of reservation lands pursuant to the Agreement of December 31, 1892, 28 Stat. 314. [28 Ind.Cl.Comm. at 373.]

The claims so reserved by the plaintiff were continued before the Commission and assigned to Docket No. 332–D (the instant case). A number of preliminary procedural matters were decided by the Indian Claims Commission in an earlier opinion in this Docket 332–D, *Yankton Sioux Tribe v. United States*, 37 Ind.Cl.Comm. 64 (1975). There, the plaintiff was ordered to show

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

cause why its post-June 30, 1951 accounting claim should not be dismissed; plaintiff's motion for a supplemental accounting with respect to the land dispositions made by defendant pursuant to the Agreement of December 31, 1892, 28 Stat. 314 (1894) was denied; defendant's motion to dismiss plaintiff's claims with respect to the disposition of plaintiff's lands pursuant to the Agreement of December 31, 1892, *supra*, was denied; and the defendant was ordered to supplement its 1965 Accounting Report with respect to certain disbursements. The post-June 30, 1951 accounting claim was subsequently dismissed. *Yankton Sioux Tribe v. United States*, 39 Ind.Cl.Comm. 149, 157 (1976). The supplemental accounting which was ordered by the Commission was filed by the defendant in late March 1976. Plaintiff's exceptions to defendant's accounting were filed on September 29, 1976, and defendant's response to those exceptions was filed on December 20, 1976.

Then, by order entered on February 2, 1977, the Commission set this case for trial on September 12, 1977, on the valuation issues raised by plaintiff's land disposition claim under the Agreement of December 31, 1892, *supra*. That claim relates to the reservation lands reserved to the Yankton Sioux Tribe under Article I of the Treaty between the United States of America, and the Yancton Tribe of Sioux, of Dacotah Indians, April 19, 1858, 11 Stat. 743 (1859) (hereinafter Treaty of April 19, 1858). Pursuant to Articles I and II of the Agreement of December 31, 1892, *supra*, plaintiff ceded all of the unallotted lands on that reservation for a consideration of $600,000, of which the principal sum of $500,000 was placed in the Treasury at 5 percent interest, and $100,000 was paid out to tribal members *per capita*. Plaintiff contends that the $600,000 consideration for the ceded lands was inadequate, and it seeks revision of the Agreement of December 31, 1892, *supra*, and additional compensation pursuant to section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976).

Even though the Commission's Order of February 2, 1977, set only the valuation issues for trial, plaintiff treated the accounting issues as also having been set for trial. Trial was held in the week of September 12, 1977. The defendant subsequently noted that it had no objections to the Commission's deciding the accounting claims before it, even though they had not been specifically ordered for trial.

After briefing, but before a decision was issued by the Indian Claims Commission, the Commission, having determined that it could not completely adjudicate the claims remaining in the case by September 30, 1978, transferred the case to the United States Court of Claims on July 13, 1978, pursuant to section 23 of the Indian Claims Commission Act, as amended, 25 U.S.C. § 70v (1976). *Yankton Sioux Tribe v. United States*, 42 Ind.Cl.Comm. 202, 203–04 (1978). By order dated April 6, 1979, the trial judge allowed further memoranda to be filed by the parties prior to decision in this case.

In this posture, the following issues have been presented to the court for its determination:

I. *Land Claim*

A. How many acres were ceded by the Agreement of December 31, 1892, 28 Stat. 314 (1894)? This question involves two factors. One, the size of the reservation created by the Treaty of April 19, 1858, 11 Stat. 743 (1859). Plaintiff contends that it was 431,110.21 acres; defendant contends it was 400,000 acres. Two, the amount of lands allotted within said reservation. Plaintiff contends that only 230,000 acres were properly allotted; defendant claims that 268,361.95 acres were so allotted. Plaintiff, therefore, contends that 201,110.21 (rounded to 201,110) acres of unallotted lands were ceded, while defendant claims that 131,638.05 acres were ceded.

B. What was the fair market value of the unallotted lands ceded by the 1892 Agreement, *supra*, as of December 31, 1892? Plaintiff contends that said fair market value was $9.25 per acre, or, alternatively, $7.85 per acre if the lands were sold to a single investor rather than to individual

settlers. Defendant's appraiser testified that said lands had a fair market value of $3.35 per acre. The valuation differences are largely a factor of the dispute as to the size of the cession and the different adjustments of comparable sales data for improvements and for size.

## II. *Fund Claims*

Has the defendant properly accounted for the proceeds of the 1892 Agreement, *supra*? The defendant claims that it has so properly accounted and that this accounting shows no breach of any duty by the United States. Plaintiff contends that the accounting shows that the defendant breached its fiduciary obligations in several respects, for which plaintiff is entitled to $241,926 in damages.

## I. *Land Claim*

Numerous cases have expressed the view that, when dealing with Indian property, the Government may be acting as a "trustee." *Navajo Tribe of Indians v. United States*, 364 F.2d 320, 322, 176 Ct.Cl. 502, 507 (1966). *See, e. g., Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942); *Menominee Tribe v. United States*, 101 Ct.Cl. 10, 19 (1944). *See also Oneida Tribe v. United States*, 165 Ct.Cl. 487, 494, *cert. denied*, 379 U.S. 946, 86 S.Ct. 441, 13 L.Ed.2d 544 (1964), where Judge Davis indicated that it was unnecessary to determine whether the relationship between the tribe and the United States was technically a trusteeship or a guardianship, since in any event the United States had a special duty of care regarding the Oneida tribe's property, under the circumstances. In the present case, the Indian Claims Commission has already specifically ruled that the Treaty of April 19, 1858, 11 Stat. 743 (1859), imposed upon the United States Government "the fiduciary duty to protect the integrity of the Plaintiff's property, i. e., the reservation lands." *Yankton Sioux Tribe v. United States*, 37 Ind.Cl. Comm. 64, 81 (1975). Accordingly, the defendant must be deemed to have been a trustee with respect to the Yankton Sioux Reservation lands.

It is well-settled that "the standard of duty for the United States as trustee for Indians is not mere 'reasonableness,' but the highest fiduciary standards. *See, e. g., United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973)." (other citations omitted). *See also Coast Indian Community v. United States*, 550 F.2d 639, 652–53, 213 Ct.Cl. 129, 153 (1977). Moreover, as the Court noted in *Sac and Fox Tribe of Indians v. United States*, 167 Ct.Cl. 710, 724, 340 F.2d 368, 375 (1964):

In defining the fiduciary obligation assumed by the Government toward Indian tribes in cases involving land sales, this court said:

A breach of that obligation by the Government may obviously involve conduct less than arbitrary, capricious, or fraudulent by an official charged with the position of trust. [*United States v. Seminole Nation*, 173 F.Supp. 784, 789, 146 Ct.Cl. 171, 179 (1959).]

Moreover, when the Government, itself, is the purchaser of the Indian lands, it may be held to an especially high duty. In *Ottawa Tribe v. United States*, 166 Ct.Cl. 373, 380, *cert. denied*, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964) the court discussed the standards applicable to a self-dealing trustee (in that case, a corrupt Indian agent committed a breach of trust against the Indians) as follows:

The law requires what is called uberrima fides, the highest good faith, in matters of this kind. There can be no shading. This is not a sudden turn in the law. It is based upon centuries of human experience. The principle has been a gradual growth. It recognizes the frailties of human nature and curtains off any possibility of personal profit from such a confidential relationship. There is thus a basic reason for applying this principle of law. It has been found, through these years of revealing experience and continuing effort to perfect the law, that the only practical way to assure proper operation is to foreclose any possibility of the trusted representative's making a personal

profit out of transactions that are linked directly or indirectly to such a relationship. They are limited to the allowance of reasonable pay for work actually performed under the assignment. With respect to the Government, when it is involved in self-dealing, although it does not make a profit for itself, yet it must seek to maximize the benefit to the Indians as its wards when it purchases and resells their lands:

> A trustee is under a duty to exercise due care and prudence to preserve the trust property. If the trustee is guilty of negligence in his dealings with that property, the trustee is liable to the beneficiary for any loss thereon. Mere evidence of a disparity between the value that the trustee realized in disposing of trust property and the fair market value at the time of that disposition, as later independently appraised, is not sufficient to establish negligence or other breach on the part of the trustee. However, demonstration of fraud or gross negligence in the actual conduct of the United States as trustee, or in the conduct of its agents, will make the Government liable for damages in breach of trust growing out of the fraud or negligence. Further, a showing that the value realized from the trust property was so far below its fair market value as to constitute fraudulent conduct, gross negligence, or other breach of a fiduciary duty, will suffice without more to establish the trustee's liability. [footnotes omitted.] [*Coast Indian Community v. United States, supra,* 550 F.2d at 653, 213 Ct.Cl. at 153–54.]

It is against this background of fiduciary responsibilities that the plaintiff's land claim must be evaluated.

## A. *The Acreage Involved*

By the Agreement of December 31, 1892, 28 Stat. 314 (1894) (hereinafter the Agreement), the Yankton Sioux Tribe ceded all of its "unallotted lands" to the defendant. The Agreement did not specify the exact number of acres so ceded. Accordingly, this court must make the threshold determination of the number of acres so ceded prior to an evaluation of the adequacy of the consideration paid for those acres. In order to make that determination, it is necessary, first, to determine the size of the Yankton Sioux Reservation and than, second, to determine the number of acres allotted to individual Yanktons up to the time of the Agreement.

### 1. *The Size of the Yankton Sioux Reservation*

In a separate and earlier proceeding, the Indian Claims Commission determined that, as of February 16, 1859, the Yankton Sioux Tribe had aboriginal title to a vast amount of land in southeastern South Dakota which included the Yankton Sioux Reservation in question in this docket. *Yankton Sioux Tribe v. United States,* 24 Ind.Cl.Comm. 208, 236–37 (1970). In that case, Docket No. 332–C, the Yankton Sioux Tribe claimed that under the Treaty of April 19, 1858, 11 Stat. 743 (1859), the United States paid the tribe an unconscionable consideration for the relinquishment of its tribal interest in certain lands other than the Yankton Sioux Reservation. The Indian Claims Commission completed consideration of that Docket No. 332–C prior to the Commission's dissolution, and the Yankton Sioux Tribe has received a judgment for their claims to certain of those lands. *See Yankton Sioux Tribe v. United States,* 43 Ind.Cl.Comm. 1 (1978), *aff'd in part* by order of the United States Court of Claims, dated March 30, 1979, entering judgment in Docket No. 332–C–1.

The Treaty of April 19, 1858, 11 Stat. 743 (1859), created the Yankton Sioux Reservation of concern in this Docket No. 332–D. That treaty provided in pertinent part as follows:

> ARTICLE I. The said chiefs and delegates of said tribe of Indians do hereby cede and relinquish to the United States all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River

and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres. They, also, hereby relinquish and abandon all claims and complaints about or growing out of any and all treaties heretofore made by them or other Indians, except their annuity rights under the treaty of Laramie, of September 17, A.D.1851.

Plaintiff contends that as of the valuation date, the Yankton Sioux Reservation contained 431,110.21 acres based on the actual plats of survey. The defendant contends that the literal language of the 1858 Treaty limited the reservation size to 400,000 acres. As noted above, the size of the Yankton Sioux Reservation is important to a determination of the number of acres ceded by the 1892 Agreement. This court agrees with the plaintiff that the Yankton Sioux Reservation contained 431,110.21 (hereinafter rounded to 431,110) acres as of the cession date of December 31, 1892.

■ At the outset this court notes that the description of the Yankton Sioux Reservation in Article I of the 1858 Treaty is ambiguous. Two of the calls were not specified: " * * * thence due north to a point [not identified]; thence easterly to a point [again not specified] * * *." The treaty description thus created an ambiguity by leaving two of the boundary points open. There were an infinite number of ways in which those two calls could define the boundaries of the Yankton Sioux Reservation, depending on the points chosen and the angle of the "easterly" slanting boundary. Accordingly, it is clear that the parties must have intended that the actual boundaries of the Yankton Sioux Reservation were to be ascertained by a subsequent survey on the ground.

The defendant surveyed the reservation three times before it finally settled the boundary. The first survey seemed to include about 400,000 acres; the second survey contained about 427,000 acres; and the final survey encompassed about 431,000 acres, with plaintiff's appraiser's estimate of 431,110.21 acres being the most accurate in the record. In the final boundaries of the reservation, while the western boundary is due north, the northern boundary is more southeasterly than "easterly" as intended by the parties to the treaty. These final boundaries of the Yankton Sioux Reservation were respected by both parties for more than three decades up until the 1892 Agreement changed those boundaries by the cession at issue in this case.

The defendant was well aware that the reservation as actually surveyed contained about 430,000 acres, and, indeed, the defendant seemed to have intended that result in adopting the last and largest survey. The local agent in 1888 anticipated that about 200,000 acres of the reservation would be allotted under the Indian General Allotment Act (Dawes Act), ch. 119, 24 Stat. 388 (1887), leaving about 230,000 acres for cession to the United States; impliedly, the agent must have thought that the reservation contained about 430,000 acres. The negotiators of the 1892 cession Agreement were also well aware that the actual size of the Yankton Sioux Reservation was over 430,000 acres and that fact was included in their report to Congress submitting the Agreement of December 31, 1892 for ratification. That Agreement was ratified by the Act of August 15, 1894, ch. 290, § 12, 28 Stat. at 319, without mention of the size of the reservation.

The defendant urges that, as a matter of law, the Yankton Sioux Reservation could not contain more than 400,000 acres as suggested by Article I of the 1858 Treaty. Citing *United States v. Kiowa, Comanche and Apache Tribes*, 479 F.2d 1369, 1373, 202 Ct.Cl. 29, 36 (1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974), defendant argues that the court and the parties are bound by the unambiguous words of the treaty. This court disagrees with the defendant's reasoning because it finds that the description of the reservation given by the 1858 Treaty was ambiguous.

It appears that the 400,000 acre figure given in the 1858 Treaty was intended to be an approximation of the acreage to be included in the reservation. The actual boundaries of the Yankton Sioux Reservation were to be established by a subsequent survey in the field. While the defendant could have adopted boundaries so that the reservation would have contained only 400,000 acres, it chose instead to define boundaries of the reservation such that over 430,000 acres were included.

█ The general rule is that ambiguities in treaties should be resolved in favor of the Indians. *See Antoine v. Washington,* 420 U.S. 194, 199, 95 S.Ct. 944 (1975); *Worcester v. Georgia,* 31 (6 Pet.) U.S. 515, 8 L.Ed. 483 (1832). As the Court said in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970):

> [T]hese treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, see, *e. g., Jones v. Meehan,* 175 U.S. 1, 11[20 S.Ct. 1, 44 L.Ed. 49] (1899), and any doubtful expressions in them should be resolved in the Indians' favor. See *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89 [39 S.Ct. 40, 63 L.Ed. 138] (1918).

Both the Court of Claims and the Indian Claims Commission have resolved doubtful expressions in Indian agreements in a manner favorable to the Indians. *See, e. g., Standing Rock Sioux Tribe v. United States,* 182 Ct.Cl. 813 (1968); *Blackfeet and Gros Ventre Tribe v. United States,* 32 Ind. Cl.Comm. 65, 111 (1973). For that matter in *United States v. Kiowa Comanche and Apache Tribes, supra,* upon which the defendant relies, the court went on to say that,

> Where the words of the Treaty leave room for more than one interpretation the court is to interpret the Treaty in a manner not prejudicial to the Indians. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515 [8 L.Ed. 483] (1832). [479 F.2d at 1373, 202 Ct.Cl. at 36.]

█ The rule resolving ambiguities in favor of the Indians is particularly applicable when such a resolution is consistent with contemporaneous interpretation of the 1858 Treaty by the executive branch in adopting reservation boundaries which included over 430,000 acres. As this court recently said in *Duncan v. United States,* 220 Ct.Cl. ——, ——, 597 F.2d 1337, 1342 (1979), *vacated and remanded on other grounds,* by the Supreme Court, April 21, 1980, —— U.S. ——, 100 S.Ct. 1827, 64 L.Ed.2d 255.

> It is a "venerable principle" that an agency's long-standing interpretation of a statute it is charged with implementing is entitled to great weight. *See, e. g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 [89 S.Ct. 1794, 23 L.Ed.2d 371] (1969); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 121 [93 S.Ct. 2080, 36 L.Ed.2d 772] (1973) (quoting *Red Lion*); *Vogt v. United States,* 537 F.2d 405, 409, 210 Ct.Cl. 246, 252–53 (1976); *Sode v. United States,* 209 Ct.Cl. 180, 187, 531 F.2d 531, 535 (1976). This principle is particularly compelling when the agency interpretation is reinforced by subsequent congressional legislation * * *. *E. g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275 [94 S.Ct. 1757, 40 L.Ed.2d 134] (1974); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381–82 [89 S.Ct. 1794] (1969).

Here the treaty description of the Yankton Sioux Reservation was inherently ambiguous, and the final boundaries of the reservation had to be settled in the field by subsequent survey. The executive branch determined to resolve the ambiguous treaty description in favor of the Indians and adopted reservation boundaries which this court has found (for present purposes) to include 431,110 acres. Those treaty boundaries were respected by both parties for over three decades prior to the 1892 Agreement, and, moreover, in ratifying the 1892

Agreement, Congress was aware that the Yankton Sioux Reservation contained over 430,000 acres. Under these circumstances this court resolves the ambiguous 1858 Treaty description in favor of the plaintiff tribe and concludes that for the purpose of determining the number of acres ceded by the tribe pursuant to the 1892 Agreement, the Yankton Sioux Reservation contained 431,110 acres.

### 2. *The Amount of Lands Allotted*

As the court stated in *United States v. Creek Nation*, 476 F.2d 1290, 1303, 201 Ct.Cl. 386, 408 (1973):

> Where reserves or grants to individual tribal members are bargained for by the tribe and are actually received by the reservees or grantees, they usually have been deducted from the acreage for which the tribe is to be compensated. *Citizens Band of Potawatomi Indians v. United States*, 391 F.2d 614, 179 Ct.Cl. 473, *cert. denied*, 389 U.S. 1046 [88 S.Ct. 771, 19 L.Ed.2d 839] (1968); *Absentee Shawnee Tribe of Oklahoma v. United States*, 165 Ct.Cl. 510 (1964); *Cherokee Freedmen v. United States*, 161 Ct.Cl. 787 (1963).

In the present case the defendant urges that 268,361.95 acres of the Yankton Sioux Reservation were allotted to and received by individual tribal members. The plaintiff contends that not more than 230,000 acres were properly allotted to members of the tribe. This court has determined that there is substantial evidence in the record to indicate that not more than 230,000 acres were properly allotted and adopts that figure for the purpose of determining the number of acres ceded by the 1892 Agreement.

■ The United States, having decided to liquidate the Yankton Sioux Reservation through allotment of some lands and cession of the rest, had a duty to do so in a responsible way. The Indian Claims Commission has described the duties of the United States when allotting Indian lands under the Dawes Act as follows:

> It must be borne in mind, however, that the United States, once having de-

cided upon and having begun to implement the dissolution of the Creek Nation became "in the nature of a trustee for liquidation purposes" with respect to the lands of the Creek Nation. See *The Chickasaw Nation of Indians v. United States* [7 Ind.Cl.Comm. 64, 89–90 (1959)]. The United States assumed the task of terminating the Nation's mode of life including its manner of holding its lands. In these circumstances and when placed within the framework of the "fair and honorable dealings" clause of the Indian Claims Commission Act, it was incumbent upon the United States to take every conceivable precaution to insure that the Creek Nation did not suffer the loss of any of its lands. [*Creek Nation v. United States*, 24 Ind.Cl.Comm. 238, 250 (1970), *aff'd* by order of April 4, 1978, 216 Ct.Cl. —— (1978).]

As the Commission stated in *Chickasaw Nation v. United States*, 7 Ind.Cl.Comm. 64, 89 (1959):

> The Government thereby assumed direct control over the property of the Indians, not for its own direct benefit, but for the benefit of the owners to liquidate and otherwise distribute same. Defendant thereby assumed such powers and functions, and we think, duties and obligations over petitioner and its property as to become in the nature of a trustee for liquidation purposes. Such failure to arrange and provide compensation to petitioner, on the part of the United States, was not an instance merely of "unconscionable consideration," it was a taking of property without any compensation to petitioner.

Thus, it is settled that the defendant assumed certain fiduciary responsibilities in undertaking to allot and liquidate the Yankton Sioux Reservation.

■ The official allotment schedules appear to the court to show that 267,943.44 acres of the Yankton Sioux Reservation were allotted. In the absence of proof to the contrary, the accuracy of such official schedules is presumed to be correct. *See, e. g., Andrade v. United States*, 485 F.2d 660,

665, 202 Ct.Cl. 988, 998 (1973), *cert. denied,* 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974), *Dargo v. United States,* 176 Ct.Cl. 1193, 1206 (1966). *Cf. Saginaw Chippewa Indian Tribe v. United States,* 41 Ind.Cl. Comm. 327, 346–47 (1978). Moreover, the burden of proving any impropriety lies with the plaintiff. *Lower Sioux Indian Community v. United States,* 36 Ind.Cl.Comm. 295, 380 (1975).

▪ Plaintiff presented substantial evidence that as a result of inefficiency, favoritism, and fraud practiced by defendant's agents in the administration of the allotment process, the Yankton Sioux Tribe lost control over a great deal of land which was listed as approved Yankton allotments in the official allotment schedules. While plaintiff was unable to prove specifically which of all the allotments were improper in every case (most likely due to the poor state of the records involving such lands), this court has concluded that the evidence of improper allotments presented by the plaintiff was more than sufficient to rebut the presumption of regularity which normally would be attached to the official allotment schedules. Moreover, other compelling evidence in the record allows this court to reach a determination of the extent of properly allotted lands.

Specifically, plaintiff has pointed this court to evidence that in 1908, the U. S. Indian Agent, R. J. Taylor, in describing the general condition of the Yanktons, listed only 230,000 acres as "original allotments." A subsequent Yankton agent, E. W. Estep, made a far more damaging statement in his 1910 annual report:

Allotments were made to 2,649 individuals and included 268,567 acres of land. It was afterwards found that quite a number of these allotments were made to ficticious [sic] persons, or were duplicate or erroneous. When these were taken out it was considered that about 230,000 acres was [sic] rightfully allotted to members of the tribe.

Even the defendant in its brief before the Indian Claims Commission conceded that approximately 3,091 acres of the approximately 38,000 acres may have been allotted improperly and suggested that the court subtract that figure from the official allotment figure to arrive at the properly allotted acres. However, in view of the entire history and record of this case, this court is more inclined to accept plaintiff's figure as more in line with what actually was invalidly allotted through haste, error, or fraud.

In any event, the above discussed evidence recorded by defendant's own agents, is quite compelling. Based on this evidence, the court has determined that not more than 230,000 acres of the Yankton Sioux Reservation were properly allotted to members of the tribe and adopts that figure for the purpose of determining the amount of land ceded by the 1892 Agreement.

### 3. *The Amount of Land Ceded*

Article I of the Agreement of December 31, 1892, 28 Stat. at 314 provided:

The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.

Thus, the Agreement of 1892 provided for the cession of all unallotted lands on the Yankton Sioux Reservation. For the purpose of determining the amount of land ceded by the 1892 Agreement, this court has concluded that the approximately 38,000 acres which were improperly allotted by defendant's agents must be treated as if they were "unallotted." Only in this way can the defendant be held to its "fiduciary duty to protect the integrity of the plaintiff's property, i. e., the reservation lands." *Yankton Sioux Tribe v. United States,* 37 Ind.Cl.Comm. 64, 81 (1975). *See also Coast Indian Community, supra; Sac and Fox Tribe, supra.*

This court has accepted the figure of 431,110 acres as the best available from the evidence presented of the total number of acres on the Yankton Sioux Reservation at the time of cession. This court has also accepted the figure of 230,000 acres as the

best available from the evidence presented on the extent of properly allotted Yankton lands. Therefore, this court concludes that the amount of subject land for which the plaintiff was entitled to adequate compensation constituted about 201,110 acres, the difference between the above two figures.

B. *The Value of the Land Ceded*

1. *Description of the Land*

The subject lands comprised the unallotted and improperly allotted lands on the Yankton Sioux Reservation which lay in the eastern portion of Charles Mix County, South Dakota. The reservation was bounded by the Missouri River on the south, Chouteau River (currently known as Chouteau Creek) and Bon Homme County on the east, Douglas County on the north, and the balance of Charles Mix County on the west. Since the Indians had taken up allotments mainly in the southern part of the subject area, but also throughout the reservation, blocks of unallotted and improperly allotted lands were located throughout the reservation. The two largest blocks were in the northeast and northwest corners of the reservation.

The Yankton Sioux Reservation was one of the finest tracts of land held by Indians in the northwest of the United States. The lands were rich, agricultural lands, with a minimum of rougher areas more suitable for pasture. The subject lands may have been slightly inferior in quality to the properly allotted lands, since most of the unallotted lands tended to lay in the northern parts of the reservation that may have been less sheltered and protected. Nevertheless, nearly all of the subject lands were arable and of good quality for crop-production farming and stockraising purposes.

The topography of the reservation area is nearly level with the exception of the land near the Missouri River. No more than 10 percent of the area was rough, river bluff area or Missouri River bottom lands. The balance of the property, or at least 90 percent of the land being valued, is located in the northern reservation portion of Charles Mix County where the topography is nearly level to gently sloping with the drainage to the south.

Most of eastern South Dakota, including over 90 percent of the subject property, has a clay-loam soil derived from glacial drift. This soil is rich in humus and is dark colored to a depth of approximately a foot. The soil is very productive and compares favorably with the more productive soils found in the upper Midwest area of the United States known as the Corn Belt.

The average annual precipitation for the subject lands is about 20 to 22 inches, three-quarters of which falls within the April-to-September growing season. The subject area is susceptible to fluctuations within and over years as to rainfall. Starting in about 1886, a cycle of dry years began which did not end until 1897. The worst of the dry years were 1889 and 1894, during which severe droughts affected the state. Crop yields were low in 1889 and 1890; however, in 1891 South Dakota had "bumper" crops, and in 1892, the year of the valuation, it also had large crop yields. The droughts appeared to be less severe in the subject area than in the more northern and western parts of South Dakota. Moreover, farmers in the southeastern parts of the state were somewhat protected from the effects of dry weather by the more diversified nature of the economy there. Also, it appears that farmers were more than able to make up for small yields in dry years by larger crop yields in the better years.

As of the valuation date, December 31, 1892, the subject lands were not crossed by an existing railroad. A railroad from the east terminating at Armour, South Dakota, in Douglas County, paralleled the northern border of the subject lands at a distance of 6 miles from that border with two stations available, one at Armour and one at Delmont. A second railroad line paralleled the eastern border in Bon Homme County at a distance of about 12 miles with stations at Tyndall and Running Water. During this period, once a rail route had been agreed upon, the building of the lines took place in what was then considered a very short time.

It may be assumed, therefore, that proximate rail transportation to all points on the Yankton Sioux Reservation could reasonably be expected to follow quite quickly after the opening of those lands. In fact, a railroad was built into the former reservation lands from east to west in 1900. It may also be noted that the southern border of the reservation was the Missouri River, although water transportation was not as important in 1892, as it was 10–12 years before, prior to the advent of the railroads.

There were also overland horse and buggy (wagon) trails or paths throughout the subject area. However, there were no established roads as the term would be understood today.

At the date of valuation, there were no known developments of mineral deposits in the subject area. There were some scattered supplies of rough building stone sufficient to satisfy local demand. The subject area was poor in fuels of all sorts. South Dakota, being prairie, was largely devoid of timber upon its plains, although there was some timber along the riverbeds.

South Dakota became a state in 1889. In 1890, the state had 348,600 people, and in 1900 it had 401,570 people. Charles Mix County had a population (apparently not counting Indians) of 407 in 1880, over 4,000 in 1890, and over 8,000 by 1900. From 1890 to 1895, South Dakota's population declined slightly because of economic conditions; however, this court has found that the population of Charles Mix County was probably at least 4,000 at the time of the valuation, and it was probably increasing at that time.

This court has concluded from all of the evidence in the record that the highest and best use for the subject lands as of the appraisal date would have been for agricultural purposes. Economically-sized units could be farmed as grain farms (e. g., wheat and corn) or combination grain and livestock farms.

2. *Economic Conditions and Demand for the Subject Lands*

As of the valuation date, values for land had come down from what they were at the height of the Dakota land boom in the early 1880's. In the early years of settlement, precipitation levels had been very high; however, by the late 1880's the discovery of fluctuations in precipitation levels (including drought) had depressed land values, at least initially. The valuation date, December 31, 1892, fell within a period of relative optimism between the Depression of 1884 and that of 1893. For that matter, the effects of the Panic of 1893 were not really felt in South Dakota until 1895.

On the average, grain prices fell from 1890 until at least 1900. The lower prices for grains in 1892 were more than likely due to abundant crops worldwide. The much lower prices in 1895 were the after effects of the Panic of 1893, and they could not have been foreseen on the valuation date.

For the purposes of this valuation, the most important observation about the economy is that factors governing economic conditions in the subject area were reflected in the abutting lands from which appraisers for both parties drew their comparable sales for the purpose of determining the fair market value of the subject lands.

By 1879, most of the desirable farm lands in the east had been occupied. This made the fertile areas of the Dakota Territory very desirable and encouraged rapid settlement. By 1887, most of the free land in Dakota east of the Missouri River had also been taken up by settlers. Dakota lands west of the Missouri River, opened for settlement in 1890, tended to be more suited for grazing than for crop farming. This left the subject lands as an enclave of good, undeveloped agricultural lands in an area which had already been built up with farms and villages, some of them served by railroads. The record is clear that there was a strong demand for the opening of the arable but "idle" Yankton lands.

Pursuant to the authority vested in him by the Act of August 15, 1894 (which ratified the 1892 Agreement), the President of the United States, by Proclamation of May 16, 1895, 29 Stat. 865 (1895), opened over

150,000 acres of the Yankton Sioux ceded lands for entry by settlors. Settlement proceeded at a rapid pace. In the 75½ months remaining of the year 1895, over 56,000 acres were taken up by settlors. In 1896, over 13,000 additional acres were taken up, and in 1897, over 35,000 acres were taken up. Thus, over 100,000 acres were taken up in the first 3 years. During the first 5 years, almost 90 percent of the lands were taken up. Thus, it is clear from the record that there was an extensive demand for the type of agricultural lands present on the Yankton Sioux Reservation.

### 3. *The Plaintiff's Appraisal*

The plaintiff tribe relied upon Mr. Neil A. Thomas, a land appraiser from Denver, Colorado, to establish an 1892 fair market value for the ceded lands on the Yankton Sioux Reservation. Mr. Thomas submitted an appraisal report and testified for the plaintiff tribe in support of his value conclusions and in rebuttal of the conclusions reached by the defendant's appraiser. As a result of his initial efforts and based on the legal theory that the Yankton lands should have been sold by appraisal and sale of economically-sized farms to individual settlers, Mr. Thomas concluded that in 1892, the ceded lands were worth about $9.25 per acre; this translates into about $1,860,-267.50 for the 201,110 acres herein involved. Based on the legal theory that the entire subject property would be sold to a single buyer who would then resell the subject lands to settlers, Mr. Thomas' rebuttal testimony offers an alternative valuation estimate for the ceded lands of about $7.85 per acre; this translates into about $1,578,-713.50 for the 201,110 acres.

Basically, Mr. Thomas used a comparable sales approach in order to arrive at an estimated fair market value of the subject lands on the valuation date of December 31, 1892. Mr. Thomas initially abstracted 1,230 apparently arm's-length sales from Bon Homme, Douglas, and Charles Mix Counties. The average size tract was 165.4 acres and the overall weighted sales price was $10.14 per acre, based on sales for the time period 1890–94. Of note, in 1892, 160 sales in Bon Homme County (to the east of the Yankton Reservation) yielded an average price per acre of $12.04; in Douglas County (to the north) 62 sales were at an average of $8.08 per acre; and in Charles Mix County (to the west) 2 sales were at an average of $9.52, and 173 sales were at $7.23 per acre. The court notes in passing that the simple average price per acre, based on all of these 1892 sales, comes to about $9.31 per acre.

After determining that location seemed to be the most important influence on price variations for the abstracted lands, Mr. Thomas focused upon the sales in the townships surrounding and immediately abutting the subject lands. Because the valuation date was December 31, 1892, Mr. Thomas utilized the sales data for the time period 1890 through 1893. There were 890 such sales in the relevant areas. Mr. Thomas computed the weighted average price per acre for each township in the study area.

Considering first the sales in the townships nearest the northeasterly portion of the subject property. Mr. Thomas noted that the sales immediately adjacent to the reservation were at prices of $12.36, $8.85, $10.11, and $10.48 per acre moving from southeast to northwest. Sales in closest proximity to the northwesterly part of the subject lands ranged in price from about $7.37 to over $10 per acre. Mr. Thomas made minor adjustments for location and quality and concluded that the northeasterly portion of the subject lands had a value of about $11 per acre and the northwesterly portion of the subject lands had a value of about $8.50 per acre. Based on an analysis of the location of the lands opened by the 1895 Presidential proclamation, Mr. Thomas estimated that about one-half of the opened lands were in the easterly portion of the reservation and the other half were in the westerly portion. Accordingly, Mr. Thomas concluded that one-half of the subject land had a value of $11 per acre and the other half had a value of $8.50 per acre, indicating an overall average value of $9.75 per acre.

To his projected $9.75 per acre average retail price for the subject lands, Mr. Thomas applied a 5 percent discount to take into account the fact that most of the subject lands were unimproved, whereas some of the lands involved in the surrounding comparable sales had the benefit of some improvements. Five percent of the $9.75 per acre comparable sales price equals $0.4875 which Mr. Thomas rounded to $0.50 per acre. This discount of $0.50 per acre leads to a net value indication of $9.25 per acre. In his initial appraisal estimate, no further adjustments or discounts were applied. Consequently, Mr. Thomas' $9.25 per acre price would yield a net value for the 201,110 acres ceded of about $1,860,267.50.

From his rebuttal testimony it is possible for this court to determine an alternative appraisal by Mr. Thomas, based on the legal theory that the entire subject property would be sold to a single buyer who would then resell the subject lands to settlers. Mr. Thomas postulated that such a prospective buyer could expect to recoup his investment within 3 years. He would expect the values of the unsold tracts within the subject tract to increase within the period of recoupment and thereafter by reasons of the improvements brought in by the first settlers. The prospective purchaser would have been aware of the potential returns to alternative forms of investment, and he would have been aware of the demand for the Yankton lands.

This hypothetical prospective purchaser would have considered the stability of the market and concluded, in light of the rate of return available to him from alternative opportunities of investment, that he would do well with 8 percent return on his money and 10 percent for entrepreneurship plus a 5 percent expense item for administrative expenses and commission costs. Thus, Mr. Thomas suggested that a reasonable discount for profit and costs would have been about 25 percent. A hypothetical purchaser could, therefore, afford to pay about 75 percent of the price that would have been obtained in the retail sales market (after discounting for improvements).

Based on the increasing land prices in the 1891 through 1892 period, Mr. Thomas speculated that his prospective purchaser would expect an increase about $2.50 an acre over the then retail price in the 3-year period which it would take to dispose of the land. Conservatively, the purchaser would have counted on an overall enhancement of at least $1.25 per acre. Adding this $1.25 figure to the $9.25 per acre unimproved value of the subject lands leads to an average $10.50 per acre resale value for the land. Applying the 25 percent discount for costs and profit, the prospective purchaser would have been willing to pay approximately $7.85 per acre for the land. Multiplied times the approximate area of the subject lands of 201,110 acres, this leads to an alternative value estimate of $1,578,713.50, if the subject lands were to be sold to a single investor.

■ After giving due consideration to Mr. Thomas' appraisal report and his testimony, the court has concluded that neither of his valuations of the subject lands is supported by the record. The initial comparable sales index value of $9.75 per acre for improved lands in the surrounding area is highly suspect because it relies in part on sales which occurred in 1893, after the December 31, 1892 valuation date. As the Commission said in *United States v. Miami Tribe*, 9 Ind.Cl.Comm. 1, 13 (1960), *aff'd*, 159 Ct.Cl. 593 (1962):

> These were occurrences that took place *after* the valuation date and could not have been known to a prospective purchaser on the valuation date, therefore, as this Commission sees it, should not be taken into consideration in determining the value of the land at the time of the cession. These facts are to be considered only as confirmation of the correctness of findings on value as made.

Thus, the Commission eschewed the use of hindsight sales where more timely data was available. *Ponca Tribe v. United States*, 28 Ind.Cl.Comm. 335, 341–42 (1972). This court agrees with the Commission that the proper role of such postcession land sales is to confirm a value conclusion and not to

forecast one. *See Yankton Sioux Tribe v. United States*, 43 Ind.Cl.Comm. 1, 8 (1978), *aff'd in part* by order of the U.S. Court of Claims, dated March 30, 1979, entering judgment in Docket No. 332–C–1. *Cf. Iowa Tribe v. United States*, 22 Ind.Cl.Comm. 385, 405 (1970); *United States v. Reynolds*, 397 U.S. 14, 16–18, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970).

Plaintiff's arguments to the contrary are not compelling. Plaintiff has urged that it is necessary to consider such subsequent sales because the valuation date, December 31, 1892, fell at the end of the year and so the 1892 sales would not sufficiently reflect the upward trend in land prices at the end of 1892. Therefore, plaintiff relied on the 1893 sales to reflect that upward trend. This court cannot agree with that approach, where, as here, there were numerous sales prior to the valuation date available for comparison. Perhaps plaintiff could have demonstrated this "upward trend" by segregating the numerous 1892 sales by month of the year. In any event, plaintiff cannot point to subsequent sales as a proxy for proof of any such "upward trend." Prospective purchasers on the valuation date could not know what the prices of land sales would be in 1893 but could only speculate. Thus, this court has concluded that Mr. Thomas' use of the 1893 sales data in this way is speculative and taints his comparable sales index and consequent appraisals.

Moreover, under advice of plaintiff's counsel, Mr. Thomas' initial appraisal assumed that the ceded Yankton lands would be sold by appraisal and sale method in family-sized plots (160 acre plots). Accordingly, only the retail price of $9.25 per acre was calculated. For reasons that are discussed more fully below, this court has determined that the proper legal theory for the purpose of valuing the subject lands is to assume that the entire 201,110 acres would have been sold to a single knowledgeable buyer who would then have resold the subject lands to settlers. Accordingly, Mr. Thomas' initial appraisal estimate is overly optimistic since it fails to discount for the costs and profits involved in buying and reselling such a vast amount of land.

Mr. Thomas' alternative appraisal estimate does properly discount for size. Unfortunately, Mr. Thomas added an enhancement value of $1.25 per acre to the unimproved value per acre of subject land which he had calculated. This enhancement value was to take into account the likelihood of a continuing "upward trend" in land prices to be expected after the valuation date. Although the court recognizes a distinction between "enhancement" and "upward trend," both concepts seek higher values based upon speculation of increased prices. This court views the reasons, previously expressed, for dismissing the evidence of post-1892 sales which indicate an "upward trend" as also necessitating the exclusion of any recovery based upon "enhancement." A prospective purchaser could not assume that retail land prices would continue to rise through the expected 3 to 5 year holding period following the cession: future prices are always speculative. Thus, the addition of enhancement value to the per acre estimated value of the subject lands makes Mr. Thomas' alternative appraisal also overly optimistic.

Although this court rejects both of the appraisals which plaintiff relies upon, it does find support in the record for Mr. Thomas' 5 percent discount for improvements and for his 25 percent discount for costs and profits and therefore adopts them. Moreover, much of the sales data offered by Mr. Thomas was helpful to this court in reaching its own appraisal estimate.

### 4. *The Defendant's Appraisal*

Mr. James L. Sawyers, a real estate appraiser from Kansas City, Missouri, was the defendant's expert witness on value. Mr. Sawyers filed an extensive appraisal report and also testified in support of his value conclusions at the trial before the Indian Claims Commission. Based on the assumption that only 159,757 acres were ceded by the 1892 Agreement, Mr. Sawyers concluded that the total value of the ceded lands would have been $535,500 or $3.35 per acre, as of the valuation date of December 31,

1892. Based on 201,110 acres ceded, at $3.35 per acre, the value of the ceded lands would be $673,718.50.

In valuing the subject lands, Mr. Sawyers also used a comparable sales approach in order to arrive at an estimated fair market value of the subject lands on the valuation date. He obtained 175 sales of land in townships adjoining the subject property. All of the sales occurred during the year 1892, and the appraiser attempted to exclude all sales which were not at arm's length. Ninety-one of the sales were located in Charles Mix County, 46 were in Douglas County, and 38 were in Bon Homme County. It appears from the record that many of the sales selected by Mr. Sawyers also had appeared in the sample of sales chosen by the plaintiff's appraiser.

In any event, having determined that the comparable sales represented a cross section of the subject property lands in reference to location and productivity, Mr. Sawyers simply averaged the sales for the three counties and came up with an average price of $9.34 per acre for the 175 sales. That figure accords well with the court's simple average of the plaintiff appraiser's 1892 sales, being $9.31 per acre.

Using 1900 census data, Mr. Sawyers developed a discount for improvements theory equal to 10.3 percent. Applied to the comparable sales price, this discount for improvements leads to a price for the unimproved subject lands equal to about $8.38 per acre. Mr. Sawyers expected that the probable sales costs would be 10 percent. He also determined that a prospective purchaser would expect to make a profit of 50 percent in order to ensure a return on his capital and provide adequate compensation for his risks. Deducting this 60 percent in discounts from the $8.38 per acre unimproved price, Mr. Sawyers concluded that a land speculator could only afford to pay $3.35 per acre for the subject lands, as of the valuation date of December 31, 1892.

While this court adopts Mr. Sawyers' $9.34 per acre comparable sales index, it rejects his value conclusion as too restrictive and not supported by the record. At the outset, of course, this court has determined that about 201,110 acres were ceded by the 1892 Agreement, and not 159,757 acres as Mr. Sawyers assumes. This court also rejects all of the discounts that Mr. Sawyers applied as being excessive.

Mr. Sawyers' discount for improvements of 10.3 percent was based on census data for the year 1900. Such a discount might be appropriate as applicable to sales occurring in 1900, but it is of limited value for determining the extent of improvements as of the valuation date, December 31, 1892, and so the court rejects Mr. Sawyers' discount for improvements. *Cf. Miami Tribe, supra; Ponca Tribe, supra* (in both cases the Commission eschewed the use of subsequent sales data where more timely data was available).

Mr. Sawyers' discount for probable sales expenses (10 percent) and his discount for profits (50 percent) are based largely upon studies of land speculators operating in Iowa and Nebraska in the 1850's, 1860's, and 1870's. Such reliance by the defendant's appraiser is also misplaced, and this court finds that the discounts for probable sales expenses and for profits used by Mr. Sawyers were excessive. This court cannot consider such earlier sales to speculators as comparable for valuation purposes. *Cf. Strong v. United States,* 43 Ind.Cl.Comm. 311, 322 (1978); *Saginaw Chippewa Indian Tribe v. United States,* 41 Ind.Cl.Comm. 327, 333, 340 (1978).

Accordingly, this court has rejected all of the discounts which defendant's appraiser sought to apply. However, much of the sales data offered by Mr. Sawyers was helpful to this court in reaching its own appraisal estimate.

5. *The Court's Valuation*

The court has concluded from all the evidence in the record that the 201,110 acres on the Yankton Sioux Reservation which were ceded by the 1892 Agreement had a fair market value of $1,337,381.50 or about $6.65 per acre, on December 31, 1892.

In settling on these figures, this court has also adopted the comparable sales approach, since there were restrictions on the sale of reservation land prior to the 1892 Agreement. The comparable sales approach has long been approved by the Court of Claims:

> Consideration of comparable private sales in and near the subject lands has been approved by this court, particularly in the absence of any private sales market for the subject lands in a number of cases. [Citations omitted.] [*Sac and Fox Tribe of Indians of Oklahoma v. United States*, 340 F.2d 368, 370, 167 Ct.Cl. 710, 714–15 (1964).]

Defendant's comparable sales index for improved lands surrounding the Yankton Sioux Reservation yielded an average price per acre of $9.34, based on 1892 sales. The plaintiff's comparable sales index for improved lands surrounding the Yankton Sioux Reservation yielded an average price per acre of $9.75, but it was based on sales occurring in the time period from 1890 through 1893. This court has rejected the plaintiff's comparable sales index because it included sales occurring after the valuation date of December 31, 1892, and such sales could not have been known to or considered by a prospective purchaser as of that date. That the inclusion of the 1893 sales inflated the plaintiff's comparable sales index is apparent from the court's own simple average of Mr. Thomas' 1892 sales data—that average yielded a price of $9.31 per acre for the comparable sales of improved land around the Yankton Sioux Reservation, based on 1892 sales. Plaintiff has failed to convince the court of any "upward trend" in land prices in 1892 which would require the court to adopt a higher figure for the valuation date than the per acre average figure for the year 1892. Accordingly, this court adopts defendant's comparable sales index price of $9.34 per acre for the improved land surrounding the Yankton Sioux Reservation as of December 31, 1892. This figure was developed by an expert appraiser, and so, from the court's point of view, is preferable to any figure that this court might itself develop from the rough sales data before it. For that matter, this figure is more favorable to the plaintiff than the court's simple average figure of $9.31 per acre.

To relate the retail sales figure to the market value of the subject lands, this court must consider the customary discounts. *See, e. g., Creek Nation v. United States*, 40 Ind.Cl.Comm. 175, 187 (1977). At the outset, this court has applied a 5 percent discount on the comparable sales lands to take into account such improvements as fencing buildings, etc. It is clear from the record that the subject lands were unimproved; whereas, some of the surrounding lands used for comparable sales had been improved to one extent or another. Defendant's appraiser relied on 1900 census data to urge a 10.3 percent improvements discount, and this court has rejected that discount because such subsequent data is of limited value to a valuation of lands in 1892. Instead, this court has adopted the 5 percent improvements discount utilized by plaintiff's appraiser, Mr. Thomas. Basically, Mr. Thomas found contemporaneous assessor records for all three of the counties from which comparable sales were drawn. His detailed analysis of those records offer substantial support *here* for the conclusion that an improvements discount of no more than 5 percent should be applied to the comparable sales index developed for the surrounding improved lands. *Cf. Yankton Sioux Tribe v. United States, supra*, 43 Ind.Cl. Comm. at 13 (where the same assessor records were deemed inapplicable to the 1859 valuation of Royce 410 lands involved there). Accordingly, this court adopts that 5 percent figure and applies it to the $9.34 per acre figure to yield a price of approximately $8.87 per acre for the ceded unimproved lands.

Plaintiff would have this court apply this $8.87 figure to the 201,110 acres of ceded lands without further discounts. The $8.87 figure is essentially a retail sales price since it is based on the sale of small parcels of comparable lands, averaging about 160 acres in size. This court notes that it is customary to apply discounts for size in such a case, and defendant so urges. *See, e.*

g., *Nez Perce Tribe v. United States*, 176 Ct.Cl. 815, 821–25 (1966), *cert. denied*, 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967); *Sioux Nation v. United States*, 33 Ind.Cl.Comm. 151, 172–73 (1974), *rev'd on other grounds*, 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *Ponca Tribe v. United States*, 28 Ind.Cl.Comm. 335, 339 (1972). Plaintiff seeks to distinguish the present situation under two alternative theories.

■ First, plaintiff urges that the 1892 Agreement should be treated as revised for the purposes of this case. Plaintiff urges that the record indicates that except for the duress practiced by defendant's negotiating commission in securing the 1892 Agreement, the Agreement would have provided for cession of the unallotted lands of the Yankton Tribe to defendant as trustee for appraisal and sale to the highest bidders. Plaintiff contends that such an appraisal and sale approach would have reflected the true wishes of the Indians and would have yielded the full retail price for the Yankton lands since the lands would have been sold directly to settlers after appraisal. Accordingly, plaintiff urges that the 1892 Agreement should be treated as if the appraisal and sale method were in the Agreement, and plaintiff cites *Creek Nation v. United States*, 26 Ind.Cl.Comm. 410 (1971), *aff'd*, 476 F.2d 1290, 201 Ct.Cl. 386 (1973), as a prime example of this court having the jurisdiction to revise the terms of treaties or agreements under the Indian Claims Commission Act, 25 U.S.C. § 70a (1976), in a proper case, wherein revision is necessary to do equity.

While this court agrees with the plaintiff that it has this authority, this court cannot agree that this is a proper case to utilize the revision power in order to alter the sale scheme provided in the Agreement. The record does suggest that initially many of the Indians, to the extent that they favored sale of their lands at all, preferred to have their lands sold directly to settlers after appraisal. Had those Indians had their way, the Agreement might have provided for cession of the unallotted lands of the Yankton Tribe to the defendant as trustee for appraisal and sale to the highest bidders.

However, the record also suggests that several of the negotiating Indians were willing to sell the land using either method of sale (*i. e.*, direct sale to one purchaser or appraisal and sale to highest bidder) provided they received a minimum of $6 per acre for the land. The Agreement formulated by the defendant's negotiators proceeded on a plan of direct sale to the United States of all unallotted lands of the Yankton Tribe. This latter plan, which included a price characterized by the negotiators as being as "low as these lands could be bought from them without coercion and about what we think they should receive," was the plan offered to the Indians. Many Indians signed the Agreement when it was first offered to them, eventually a majority of them signed, and the Agreement was ultimately ratified by Congress. Thus, it appears from the record that the Indians were willing to sell the subject lands directly to the United States for a proper price. At most, it could be said that there was a split among members of the tribe as to how they wanted to dispose of the land. While there may have been some overreaching by defendant and its agents, this court cannot conclude that such behavior amounted to fraud or duress. Under such circumstances, this court cannot accept plaintiff's argument that the court must value the Indian lands ceded solely on the basis of the fair market value of small parcels of land. *See Saginaw Chippewa Tribe, supra. See also Miami Tribe, supra*, 9 Ind.Cl.Comm. at 15, where the Commission held as follows:

> We think the law is that the value must be of the tract as a whole, and we think this is the view of the Court of Claims * * *.
>
> [T]he market value of the land involved was what a prospective purchaser, well informed of existing conditions would have been willing to pay * * *.

More recently, the Indian Claims Commission described the definition of fair market value as follows:

The established definition of fair market value is that price at which a hypothetical willing seller would sell and a hypothetical willing buyer would buy, both parties fully informed and neither being under abnormal pressure. In relating sales of small, improved parcels to the fair market value of a vast area, which in this case exceeds 8 million acres, discounts and adjustments are necessary. [*Turtle Mountain Band of Chippewa Indians v. United States*, 43 Ind.Cl.Comm. 251, 264 (1978).]

Plaintiff has failed to satisfy this court that there is any sound reason why the single purchaser theory of valuation should not be applied to the subject lands. Accordingly, this court concludes that there is no reason for departing from that normal method and general rule.

▪ Alternatively, plaintiff urges that no discount or at least no large discount for size is required in valuing the subject lands. Such a discount reflects the time and expense required to dispose of a large tract of property by resale in small parcels to settlers, as well as other such factors which would be considered by the parties to a hypothetical transaction on the valuation date. *See, e. g., Saginaw Chippewa Tribe, supra*, 41 Ind.Cl.Comm. at 336. Plaintiff contends that the 201,110 acres of subject lands do not constitute a great amount of land, and so, given the intense interest in such agricultural lands by settlers, these lands would not require a long holding period before resale. Accordingly, plaintiff contends that no large discount for size would be justified.

While this court agrees that the discounts applied by defendant's appraiser were excessive (over 50 percent), some discounts for size must be applied in valuing the subject lands of about 201,110 acres. Thus, this court acknowledges the principle stated in *Strong v. United States*, 42 Ind.Cl.Comm. 264, 275 (1978), that:

> [It] is well-settled that it is proper in valuing a large tract of frontier land to deduct from the retail sales prices of comparable lands an amount reflecting such

factors as the time and expense required to dispose of such a large tract. E. g. *Nez Perce Tribe v. United States*, 176 Ct.Cl. 815, 824 (1966), *cert. denied*, 386 U.S. 984 [87 S.Ct. 1285, 18 L.Ed.2d 233] (1967) (*aff'g in part, rev'g in part* Docket 175–B, 13 Ind.Cl.Comm. 184 (1964)); *Sac and Fox Tribe v. United States*, Docket 83, 32 Ind.Cl.Comm. 320 (1973), *aff'd* 206 Ct.Cl. 898 (1975).

A purchaser would certainly expect to pay a lower price on a purchase of a large amount of land, and so some adjustment downward is required. *Ponca Tribe, supra*, 28 Ind.Cl. Comm. at 339. *See also Miami Tribe, supra*, 9 Ind.Cl.Comm. at 16; *Yankton Sioux Tribe v. United States*, 43 Ind.Cl.Comm. 1, 16 (1978), *aff'd in part* by order of the U.S. Court of Claims, dated March 30, 1979, entering judgment in Docket No. 332–C–1. *But see Lower Sioux Indian Community v. United States*, 30 Ind.Cl.Comm. 463 (1973), *aff'd*, 519 F.2d 1378, 207 Ct.Cl. 492 (1975) (where no discount for size was applied).

Here, there were over 201,110 acres involved, and it was expected to take at least 3 years to market the property to settlers. While defendant's appraiser's discount of over 50 percent is excessive by a considerable amount (*see, e. g., Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 28 Ind.Cl.Comm. 264, 277 (1972)) and is even more than the Indian Claims Commission adopted in valuing over 11 million acres of Yankton land ceded in 1859 (*see Yankton Sioux Tribe, supra*, 43 Ind.Cl.Comm. at 16), some discount is warranted. In his rebuttal testimony, plaintiff's appraiser, Mr. Thomas, suggested that a single purchaser of the tract would expect a reasonable discount for profit and costs in the neighborhood of about 25 percent. This would include around 8 percent return on his money, 10 percent for entrepreneurship, and a 5 percent expense item for administrative expenses and commission costs. Thus, a hypothetical purchaser would have been willing to pay about 75 percent of the price that would have been obtained in the retail sales market. This court has adopted this 25 percent discount for size, noting that

this figure is supported by substantial evidence in the record. Accordingly, the per acre value of the subject lands reduces to $6.65 per acre (.75 x $8.87). Therefore, the 201,110 acres of ceded subject lands were worth $1,337,381.50 on December 31, 1892.

### 6. *Defendant's liability*

■ In exchange for the subject lands, the United States under the 1892 Agreement, promised to pay the plaintiff tribe $600,000 as compensation. When compared to the 1892 fair market value of the subject lands ($1,337,381.50) that promised 1892 consideration was unconscionable and grossly inadequate. The court concludes that the defendant is, therefore, liable to the plaintiff in an amount equal to the difference between the 1892 value of the subject lands and the $600,000 consideration appropriated under the 1892 Agreement, plus any funds improperly accounted for by defendant, less any other payments on the claim.

### II. *Fund Claims*

Although the accounting for proceeds under the 1892 Agreement was not specifically set for trial in the Commission's order of February 2, 1977, both parties have expressed a willingness to have these issues resolved on the basis of the record as it now exists. Included in the record is a three-volume accounting report prepared by the General Services Administration and dated August 25, 1965 (hereinafter the 1965 Accounting Report), a supplemental accounting report filed on March 5, 1976 (hereinafter the 1976 Accounting Report), plaintiff's supplemental exceptions to the defendant's accounting, and defendant's response to those exceptions. At trial both parties also introduced relevant witnesses and documents. On this record, the court has proceeded to decide the accounting for funds issues before it.

The court notes that the Indian Claims Commission had already ruled that the defendant owed certain fiduciary responsibilities to the Yankton Sioux Tribe with respect to the proceeds of the 1892 Agreement. *Yankton Sioux Tribe v. United*

*States,* 37 Ind.Cl.Comm. 64, 82–92 (1975). The Commission, noted that the 1892 Agreement and the Act of March 2, 1907, ch. 2523, 34 Stat. 1221, subjected the defendant to several restrictions in the handling of the Yankton Sioux Fund. *Id.,* at 89. As the Commission stated:

Whether the defendant complied with these restrictions is the subject of the plaintiff's claim for accounting for the proceeds of the 1892 Agreement which were placed in the Yankton Sioux Fund and the defendant has the burden of making a proper accounting. *Cf. Sioux Tribe v. United States,* 105 Ct.Cl. 725, 802 (1946). [*Yankton Sioux Tribe v. United States, supra,* 37 Ind.Cl.Comm. at 89.]

■ The court will hereafter address the plaintiff's five exceptions that remain for decision from the original eight exceptions contained in plaintiff's Supplemental Exceptions to Defendant's Accounting Report filed with the Commission on September 26, 1976. Plaintiff's exceptions C, D, G, and part of H have been waived, abandoned or otherwise are not appropriate for decision.

### *Exception A*

■ Plaintiff excepted to the transfer of $1.75 of tribal funds to the Federal Treasury as surplus funds placed into miscellaneous receipts as noted in the 1965 Accounting Report at 293. The defendant was obligated under section 1 of Article III of the 1892 Agreement to pay the plaintiff $100,-000 to be divided among members of the tribe *per capita.* All but $1.75 of that fund was so distributed. This court concludes that the $1.75 not so distributed should have been deposited in the principal fund created by the 1892 Agreement to be held for plaintiff in the Treasury; defendant was not free to appropriate that $1.75 for its own use. Despite defendant's contention that the fund at stake is *de minimis,* this court finds that the misuse of $1.75 is not so small as to ignore, especially since this exception is one of several claims, the combined result of which is a rather substantial sum. *See Blackfeet and Gros Ven-*

tre Tribes, supra, 32 Ind.Cl.Comm. at 121–22. Accordingly, plaintiff is entitled to recover for this $1.75 which the defendant has mismanaged.

### Exception B

Plaintiff excepted to the disbursement of $3,000 from interest funds belonging to the plaintiff as recited in the defendant's 1965 Accounting Report, at 304. As a general rule,

> The burden is on the defendant to make a proper accounting. *Sioux Tribe v. United States*, 105 Ct.Cl. 725, 802 (1946). Thus for a particular item to be exceptionable, the test is not whether the report shows it to be improper; it is enough if the report fails affirmatively to show that it was proper. When the plaintiff makes his exception, it then becomes incumbent upon the Government to satisfy the Commission as to the legality of the challenged item. [Citations omitted.] [*Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 85 (1973).]

*See also Mescalero Apache Tribe v. United States*, 23 Ind.Cl.Comm. 181, 185 (1970), where the Commission stated:

> The burden is on the United States to provide a report in such detail, from all available data, so that it may be readily ascertained whether plaintiffs' funds were properly managed.

▬ Here, plaintiff has excepted to the 1929–1930 expenditures of its interest funds because it claims they were spent for the defendant's benefit and not for the benefit of the tribe. As a general rule, disbursements for defendant's own benefit are an improper use of a fund which the United States holds in trust for an Indian tribe. *Cf. Sioux Tribe v. United States*, 64 F.Supp. 312, 322–23, 329, 105 Ct.Cl. 725, 783–84, 797, *vacated and remanded per curiam*, 329 U.S. 685, 67 S.Ct. 121, 91 L.Ed. 599 (1946), *on remand*, 78 F.Supp. 793, 112 Ct.Cl. 50 (1948) (affirming and reentering 1946 Court of Claims opinion), *cert. denied*, 337 U.S. 908, 69 S.Ct. 1045, 93 L.Ed. 1720 (1949). More specifically, administrative expenses of a United States Indian agency are not proper objects for the expenditure of tribal trust funds. *Sioux Tribe v. United States, supra*, 64 F.Supp. at 322, 105 Ct.Cl. at 783 (1946); *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 39 Ind.Cl.Comm. 446, 452 (1977); *Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl.Comm. 65, 117 (1973).

▬ After examining the disbursement schedule and the vouchers on which the schedule was based, this court has concluded that it is likely that all of the expenditures for the 2-year period of 1929–1930 which plaintiff excepts to here were for agency rather than tribal benefit. Expenditures frequently had the notation "Activity-Agency" and went for such things as agency buildings, repairs, telephone charges, and office equipment. Defendant had the burden of showing affirmatively which disbursements, or portions thereof, were legal and proper, but it made no such showing. *Cf. Three Affiliated Tribes of the Fort Berthold Reservation v. United States, supra*, 39 Ind.Cl.Comm. at 460. As the Court of Claims stated in *Sioux Tribe v. United States, supra*, 64 F.Supp. at 329, 105 Ct.Cl. at 797:

> In these circumstances the burden is on the Government, since the agencies are primarily its obligation, to satisfactorily show, if such be the fact, what portion of the total expenses of the agencies should not be assumed by it and be charged to the Indians as disbursements in payment of obligations of the Indians. We have no such proof in these cases. On the other hand plaintiff Indians in these cases have made out a *prima facie* case and have shown by a preponderance of the evidence, that the agency expenses herein question represented obligations of the Government under the established Indian policy * * *.

Here, also, plaintiff has made a *prima facie* showing of mismanagement of plaintiff's interest funds, and defendant has failed to rebut that showing that the 1929–1930 expenditures were for agency expenses rather than for the benefit of the

Yankton Sioux Tribe. Accordingly, this court concludes that the plaintiff is entitled to reimbursement of the $3,000 fund because the disbursements appear from the record to have been improper.

*Exception E*

Plaintiff excepted to the *per capita* payment of $19,992 in Fiscal Year 1896 out of principal of the Yankton fund. This 1896 *per capita* distribution was subject to the limitations of Article IV of the 1892 Agreement which provided:

> The fund of five hundred thousand dollars ($500,000) of the principal sum, placed to the credit of the Yankton tribe of Sioux Indians, as provided for in Article III, shall be payable at the pleasure of the United States after twenty-five years, in lawful money of the United States. *But during the trust period of twenty-five years, if the necessities of the Indians shall require it, the United States may pay such part of the principal fund as the Secretary of the Interior may recommend, not exceeding $20,000 in any one year.* At the payment of such sum it shall be deducted from the principal sum in the Treasury, and the United States shall thereafter pay interest on the remainder. [Emphasis added.] [28 Stat. at 315.]

This court has found that the necessities of the Indians required this payment of $19,992 to be made. The necessity which caused the payment to be made was not in any way created by the defendant. The Indians had specifically asked for the money as they had experienced 2 years of crop failures and were in need of adequate supplies of food and clothing. The Secretary of the Interior approved their request and recommended that this payment be made, and it was for less than $20,000 as required by the 1892 Agreement. Accordingly, plaintiff's objection that the distribution of principal was improper because there was no need for it is rejected as not supported by the evidence.

Plaintiff also objects that it was improper for the defendant to distribute the principal fund here prior to the distribution of interest. It is true that distributions of a principal fund prior to distributions of interest can be violations of the United States' responsibilities to its Indian wards. *See Menominee Tribe v. United States*, 101 Ct.Cl. 10, 21 (1944). Here, however, it appears that the defendant met all its obligations to the plaintiff. It is true that the semiannual interest payment, due on or around December 31, 1895, was delayed until after the distribution of the principal involved herein, but it appears to this court that the distributions were essentially simultaneous. The Indians desperately needed money to get through the tough winter and so filed a petition, dated December 2, 1895, requesting a distribution of some of the principal. Indeed, they requested $100,000 of the principal fund. The Secretary of the Interior authorized the $19,992 payment herein, and this was followed shortly after by the semiannual interest payment. This court cannot say that the Secretary of the Interior abused his discretion in authorizing the principal distribution in question. Accordingly, the plaintiff's exception is rejected.

*Exception F*

Plaintiff excepted to the *per capita* payments from the plaintiff's 1892 principal fund for the period starting after Fiscal Year 1907 through Fiscal Year 1919. This court has found that the defendant has fully accounted for the proceeds and disbursements herein involved; that is, all the disbursements were made pursuant to proper authority.

The Act of March 2, 1907, 34 Stat. 1221, authorized the Secretary of the Interior, in his discretion,

> to designate any individual Indian belonging to any tribe or tribes whom he may deem to be capable of managing his or her affairs, and he may cause to be apportioned and allotted to any such Indian his or her pro rata share of any tribal or trust funds on deposit in the Treasury of the United States to the credit of the tribe or tribes of which said Indian is a member * * *.

Section 2 of that act provided for payments to blind, crippled, and otherwise incompe-

tent Indians. Pursuant to the act and its subsequent amendment, three sets of regulations were promulgated during the period in controversy. It appears from the record that the defendant complied with the relevant regulations applicable at the time of the various distributions to individual Indians which plaintiff has excepted to herein. It also appears that those regulations promulgated by the executive branch of the Government were reasonable and consistent with the intent of the statute involved.

The Indian Claims Commission has already ruled that the 1907 Act abrogated the $20,000 limitation from the Article IV of the 1892 Agreement. In part, the Commission stated:

> The Act of March 2, 1907, *supra*, represents an instance of the exercise of Congress' power to administer tribal funds for the benefit of its Indian wards as it deems beneficial. This statute applied to all Indian trust funds and mandated the implementation of Congress' decision that allocation of tribal funds to individual tribal members was the course it devised to follow. [*Yankton Sioux Tribe v. United States*, 37 Ind.Cl.Comm. 64, 88 (1975).]

Since this court has found that the defendant's distributions appear to comply with the applicable statute and regulations promulgated under it, plaintiff's exception here must be rejected.

*Exception H*

In this exception, the plaintiff challenges all of the *per capita* distribution of interest on the Yankton Sioux fund. This court finds that defendant's interest payments from Fiscal Year 1895 through Fiscal Year 1925 complied with the provisions of the 1892 Agreement.

Article VI of the 1892 Agreement, 28 Stat. at 316, provides:

> After disposing of the sum provided for in Article V, the remainder of the interest due on the purchase money as stipulated in Article III shall be paid to the Yankton tribe of Sioux Indians semiannually, one-half on the thirtieth day of June and one-half on the thirty-first day of December of each year, in lawful money of the United States, and divided among them per capita. The first interest payment being made on June 30th, 1893, if this agreement shall have been ratified.

Disbursement Schedule No. 42 of the 1965 Accounting Report (at p. 298) demonstrates that defendant complied with Article VI of the 1892 Agreement in disbursing interest payments to the plaintiff from Fiscal Year 1895 through Fiscal Year 1925.

Plaintiff does not so much except from the fact of distribution to tribal members under Article VI as it does to the propriety of that distribution. Plaintiff would have preferred the interest due the Yankton Tribe to have been distributed pursuant to the provisions of Article V of the Agreement. Under Article V, the Agreement promised that the defendant would match interest funds used for tribal purposes up to $6,000 per year. Plaintiff notes that had this provision been implemented, the Yanktons could have received up to $210,000 (35 × $6,000) in addition to the $600,000 compensation provided for in the Agreement. Of course, the Agreement provided that the choice between distributing the total interest fund as *per capita* (under Article VI) or expending a portion of it for tribal purposes (under Article V) was left to the Secretary of the Interior and not to the Yankton Indians. The Secretary chose to pay out all interest earned on the principal fund *per capita*; hence, no matching funds were made available to the tribe.

On plaintiff's motion for summary judgment, the Indian Claims Commission ruled that the matching fund provisions of the 1892 Agreement were discretionary with the Secretary, and therefore, as a matter of law, the defendant was not liable for failure to activate the provision (being Article V). *Yankton Sioux Tribe v. United States*, 37 Ind.Cl.Comm. 64, 91–92 (1975). The Commission also ruled that the defendant's interest distributions were properly accounted for. The Commission stated:

> With respect to defendant's accounting for the disposition of the fund entitled

"Interest on Yankton Sioux Fund," we believe that defendant has properly accounted and, consequently, that no supplemental accounting is necessary. Article V, Section 1, and Article VI of the 1892 Agreement read in conjunction provide, in effect, that the Secretary of the Interior had discretion to set aside out of interest amounts not in excess of $6000 per year for certain enumerated purposes, and, in those instances where said funds might be so set aside, Congress became obligated to appropriate an amount equal to or greater than the amount so determined by the Secretary of the Interior. All interest not so set aside at the Secretary's discretion was to be paid semi-annually to individual Yankton Sioux Indians per capita. Since disbursements under Article V, Section 1 of the Agreement were discretionary and since Congress was required to appropriate matching funds only where the Secretary chose to disburse funds pursuant to said provision of the Agreement, no liability arose when the Secretary chose not to disburse funds under said provision. Disbursement Schedule No. 42, Section J (Volume II, at 298) shows that during each fiscal year between 1895 and 1925 (except 1924 when the principal fund contained a balance of only $89.69) all interest was paid out in per capita installments. This distribution of interest was proper based upon the provisions of the 1892 Agreement enumerated above. [*Yankton Sioux Tribe v. United States*, 37 Ind.Cl.Comm. 64, 91–92 (1975).]

The Commission's rulings in this regard seem eminently reasonable and this court adopts them. Moreover, this court finds that there is substantial evidence in the record to demonstrate that the defendant properly accounted for the interest on the Yankton Sioux fund, and that this distribution of interest was proper based upon the provisions of the Agreement of December 31, 1892.

### III. Setoff For Prior Judgment

It is apparent that the plaintiff, by virtue of an award in Docket 332–C, *Yankton Sioux Tribe v. United States*, 43 Ind.Cl. Comm. 1 (1978), *aff'd in pertinent part* by order of the U.S. Court of Claims in Docket 332–C–1, dated March 30, 1979, has already recovered payment for some acres in Docket 332–C which are actually a part of the acreage claim in the present Docket 332–D. Since it is neither the policy of this court nor the intention of Congress as expressed in the Indian Claims Commission Act to allow plaintiff to recover twice for the taking of its land, an adjustment must be made to the award in this docket.

In Docket 332–C, the Indian Claims Commission found it necessary to outline the extent of all the aboriginal lands of the Yankton Sioux Tribe which were situated east of the Missouri River. *See Yankton Sioux Tribe v. United States*, 24 Ind.Cl. Comm. 208, 234–35 (1970). Subsequently, the parties came to a basic agreement that the total award area described by the Commission included 11,587,000 acres as determined by planimeter. That total award area included the lands claimed by the plaintiff in Docket 332–C (basically Royce Area 410) as well as the Yankton Sioux Reservation involved in the present case (basically Royce Area 411). Docket 332–C concerned the lands taken by the defendant under the Treaty of April 19, 1858, 11 Stat. 743 (1859), whereas Docket 332–D concerns the lands in the total award area which were reserved to the Yankton Sioux Tribe under Article I of that treaty. In Docket 332–C, both parties sought to prove the extent of the Royce 410 acreage claim involved in that docket by subtracting an estimate of the Yankton Sioux Reservation area of the current Docket 332–D (basically Royce Area 411) from the total award area of 11,587,000 acres which was basically agreed upon.

Plaintiff estimated that the Yankton Sioux Reservation contained 431,110 acres and so determined that the ceded Royce 410 lands involved in Docket 332–C contained about 11,155,890 acres. Defendant countered that the Yankton Sioux Reservation contained about 418,269 acres and so computed the remaining area to contain 11,168,-

731 acres. Plaintiff noted that the computations of the acreage of the Yankton Sioux Reservation (Royce 411) by both parties were based upon official plats of surveys which did not include the bed of Lake Andes which lay in Royce Area 411. Since the planimeter measurement of the total award area presumably did not exclude the bed of Lake Andes which lay within the Yankton Sioux Reservation (Royce 411) and also within the total award area, both parties overestimated Royce 410 by 3,910.86 acres.

In Docket 332–C, the parties were concerned about the size of the Royce Area 410 lands and not the actual size of the Yankton Sioux Reservation directly. The acreage of the Yankton Sioux Reservation was only of indirect interest insofar as it was being used to determine the size of the Royce Area 410 lands involved therein. Neither party objected to the other party's proposed finding as to the acreage of the Royce 410 area involved in 332–C. There was, after all, only a 12,841-acre difference between the plaintiff and the defendant, whereas over 11 million acres were involved in the claim in Docket 332–C. Indeed, plaintiff indicated that it thought that the 12,841-acre difference between plaintiff and defendant was *de minimis* for the purpose of the proceeding in 332–C. This view is not at all surprising to this court given that an adoption of the defendant's acreage estimate in that docket would (and did) lead to a greater recovery for the plaintiff in that docket, since defendant estimated that there were 11,168,731 acres in the subject area; whereas, plaintiff estimated that there were only about 11,155,890 acres in the area.

The Commission decided the merits of Docket 332–C and made a finding that the Royce Area 410 lands therein involved consisted of 11,168,731 acres. *Yankton Sioux Tribe v. United States, supra,* 43 Ind.Cl. Comm. at 30. Thus, the Commission adopted the defendant's proposed finding as to acreage for the purposes of Docket 332–C. It is implicit that the Commission must have agreed with the defendant that, for the purposes of Docket 332–C, the Yankton

Sioux Reservation must have contained 418,269 acres, since the defendant estimated the size of the Yankton Sioux Reservation at 418,269 acres in order to come up with its estimate of 11,168,731 acres in the tract involved in Docket 332–C. Moreover, this last figure of 11,168,731 acres also overestimated the size of the tract by an additional 3,910.86 acres which plaintiff has suggested represents the area of the Lake Andes bed.

This court thinks that the plaintiff properly reserved the issue of the size of the Yankton reservation until this case. This court has found that for the purpose of determining the extent of the lands ceded by the Agreement of 1892, the Yankton Sioux Reservation contained 431,110 acres (plaintiff did not introduce any evidence as to the size of the Lake Andes bed in this case). Since this court is not convinced by any arguments that plaintiff has made that the Yankton Sioux Reservation increased in size from the earlier valuation date (in the late 1850's) to the current valuation date (December 31, 1892), it appears that plaintiff has received compensation for some acres in Docket 332–C which are the subject of this docket as well. Therefore, certain adjustments must be made to prevent a double recovery. Specifically, one adjustment must be made for the overestimate resulting from ignoring the Lake Andes bed, and another must be made for the acreage estimate of the Yankton Sioux Reservation which may be inferred from the decision in Docket 332–C.

The best evidence offered by plaintiff in Docket 332–C indicates that the Yankton Sioux Reservation contained 431,110.21 acres plus 3,910.86 acres in the Lake Andes bed for a total of 435,021.07 acres, or approximately 435,021 acres. Since the parties were in agreement that the total award area was 11,587,000 acres, this would mean that there were approximately 11,151,979 acres in the area involved in Docket 332–C. Since plaintiff was, in fact, compensated on the basis of 11,168,731 acres which the Commission found to be in that area, for the purpose of this Docket 332–D, plaintiff has already received some compensation for the

acres involved here. Specifically, plaintiff has already been awarded some compensation on 16,752 acres which this court finds are really a part of the Yankton lands involved in the present docket or reserved as a part of the Lake Andes bed.

For the purpose of the present setoff, this court assumes that those 16,752 acres were agricultural lands rather than the more valuable townsite lands. In Docket 332–C, the Commission valued such agricultural lands at $1.18 per acre. *Yankton Sioux Tribe v. United States, supra*, 43 Ind.Cl.Comm. at 18. Accordingly, in Docket 332–C, plaintiff received compensation for 16,752 acres on the Yankton Sioux Reservation at $1.18 per acre for a total of $19,767.36. Therefore, this court concludes that $19,767.36 must be deducted from the recovery on plaintiff's land claim.

*IV. Summary of Plaintiff's Award*

The lands ceded by the plaintiff on December 31, 1892, had a fair market value $1,337,381.50. As consideration for these ceded lands, the United States paid $600,000. Plaintiff is tentatively entitled to receive $737,381.50 to make up for the unconscionable consideration under the 1892 Agreement. In addition, plaintiff is entitled to recover an additional $3,001.75 for improper management and misuse of plaintiff's principal and interest funds. As discussed above, plaintiff has already received an additional $19,767.36 for the ceded or reserved lands, based on an earlier judgment in Docket 332–C; this amount must be deducted from the present award. Accordingly, plaintiff is entitled to recover a total of $720,615.89 as a final award against the defendant in this docket.

## CONCLUSION

Based upon the findings of fact and the foregoing opinion, the court concludes as matter of law that:

1. The lands ceded by plaintiff to defendant pursuant to the Agreement of December 31, 1892, 28 Stat. 314 (1894), totaled 201,110 acres, and the value thereof as of December 31, 1892, was $1,337,381.50 (approximately $6.65 per acre).

2. As consideration for the ceded lands, the United States paid $600,000, which consideration is grossly inadequate and is unconscionably low within the meaning of section 2 of the Indian Claims Commission Act of 1946, 25 U.S.C. § 70a (1976).

3. Plaintiff is thereby entitled to the difference between the determined value of the lands ceded of $1,337,381.50 and the consideration already paid for the lands ceded of $600,000, minus the offset for prior judgment in Docket 332–C of $19,767.36, which computes to $717,614.14.

4. Plaintiff is also entitled to recover an additional $3,001.75 for improper management of plaintiff's principal and interest funds. Section 2 of the Indian Claims Commission Act of 1946, 25 U.S.C. § 70a (1976).

5. Accordingly, plaintiff is entitled to recover a final total of $720,615.89 as a final award against the defendant and judgment is entered therefor.